953 F.2d 1240
 58 Empl. Prac. Dec. P 41,256
 Fred L. PATRICK, Plaintiff-Appellee and Cross-Appellant,
v.
Eugene MILLER, individually and in his official capacity as
City Manager of the City of Norman; John Bloomberg,
individually and in his official capacity as Director of
Administrative Services, Defendants-Appellants and Cross-Appellees,
The City of Norman, a Municipal corporation, Defendant.
 Nos. 90-6359, 90-6388.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 27, 1992.
 
 Kenneth L. Buettner (Steven R. Welch, with him on the briefs) of McAfee & Taft, P.C., Oklahoma City, Okl., for plaintiff-appellee and cross-appellant.
 Jim T. Priest (Debra B. Cannon, with him on the briefs) of McKinney, Stringer & Webster, P.C., Oklahoma City, Okl., for defendants-appellants and cross-appellees.
 Before MCKAY, BARRETT and BRORBY, Circuit Judges.
 BRORBY, Circuit Judge.
 
 
 1
 After being terminated from his position as Finance Director for the City of Norman, Oklahoma, Plaintiff brought a 42 U.S.C. § 1983 action alleging Defendants' conduct violated his constitutional rights under the First and Fourteenth Amendments. Plaintiff also alleged a violation of his statutory civil rights under 42 U.S.C. § 1981. Defendants moved for summary judgment, claiming protection from suit under the doctrine of qualified immunity. The district court denied Defendants' motion with respect to Plaintiff's § 1983 claim. However, the district court granted Defendants' Motion for Summary Judgment on grounds of qualified immunity with respect to Plaintiff's § 1981 claim. These rulings appear before this court on Defendants' appeal and Plaintiff's cross appeal. We reverse in part and affirm in part.
 
 I. FACTUAL BACKGROUND
 
 2
 The following facts are undisputed. Plaintiff Fred L. Patrick (Patrick) was employed as Finance Director and City Controller by the City of Norman, Oklahoma (City) from February 16, 1988 to August 17, 1988. Patrick's employment with the City was terminated on August 17, 1988 by Defendant Eugene Miller (Miller), the City Manager, and Defendant John Bloomberg (Bloomberg), the Director of Administrative Services (collectively "Defendants"). While under the City's employ, Patrick's responsibilities included serving as Chairman of the City of Norman Retirement Board and supervising the City print shop. Patrick alleges two incidents pertaining to his performance of these responsibilities ultimately resulted in his termination.
 
 
 3
 On May 18, 1988, Shirley Franklin, a black print shop employee, initiated a racial discrimination complaint against the City of Norman with the Oklahoma Human Rights Commission. Her affidavit submitted May 26, 1988 charged the City with discriminatory treatment on the basis of race, stemming from Defendant Bloomberg's denial of a mileage reimbursement request. The official complaint, signed by Franklin and filed with the Oklahoma Human Rights Commission and the Equal Employment Opportunity Commission on June 10, 1988, was served on the City June 16, 1988. Patrick, as print shop supervisor, was aware of Franklin's actions. In fact, Patrick intended to assist Franklin in preparing her discrimination complaints after he realized City officials would take no corrective action. The City officials were aware of Patrick's involvement because on or about June 16, 1988, Patrick met with City Attorney Jeff Raley to discuss Franklin's request for Patrick's assistance. Raley and Patrick met again on or about June 23, 1988, and decided it would not be in Patrick's best interest to continue to assist Franklin with her complaints.
 
 
 4
 On June 21, 1988, Patrick, while chairing a meeting of the City of Norman Retirement Board, expressed concern that certain retirement funds were being used to balance the City's fiscal year 1989 budget. As a result, the Retirement Board voted to seek the City Attorney's opinion as to the propriety of such conduct. Patrick's comments at the meeting greatly disturbed Defendant Miller, so much so that he commented to Defendant Bloomberg Patrick should be fired.
 
 
 5
 Prior to the Franklin and Retirement Board incidents, Patrick's job performance had never been evaluated. However, on or about June 22, 1988, the day after the Retirement Board meeting, Miller and Bloomberg informed Patrick his continued employment with the City was in jeopardy. Defendants documented this unsatisfactory performance evaluation in a letter to Patrick dated June 28, 1988. Notice of termination was subsequently delivered to Patrick on July 15, 1988.
 
 
 6
 Patrick was afforded a pretermination hearing on August 16, 1988, conducted by George Shirley, City Personnel Director. Shirley affirmed Bloomberg's decision to terminate Patrick, and notified Patrick of his right to appeal the decision to Defendant Miller, the City Manager. Patrick pursued his appeal; however, Miller declined to overrule Patrick's termination. This suit was timely commenced after Patrick received a right to sue letter from the Equal Employment Opportunity Commission, dated March 30, 1990.
 
 II. ANALYSIS
 
 7
 This appeal and cross appeal present a single legal issue: whether Defendants Miller and Bloomberg are qualifiedly immune from Patrick's § 1981 and § 1983 claims.
 
 
 8
 Because qualified immunity offers protection from suit rather than a mere defense to liability, the benefits to be gained by asserting qualified immunity would be lost if a case were erroneously permitted to go to trial. Consequently, a district court's ruling granting or denying qualified immunity is appealable as a "final decision" under 28 U.S.C. § 1291. Mitchell v. Forsyth, 472 U.S. 511, 526, 530, 105 S.Ct. 2806, 2815, 2817, 86 L.Ed.2d 411 (1985); Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 644 (10th Cir.1988). On appeal of such a ruling we need only determine whether defendants violated "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time the challenged conduct occurred. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); Losavio, 847 F.2d at 645. This is a purely legal question which we review de novo. Mitchell, 472 U.S. at 528-30, 105 S.Ct. at 2816-17; McEvoy v. Shoemaker, 882 F.2d 463, 465 (10th Cir.1989).
 
 
 9
 In order to preserve the protections afforded government officials by the qualified immunity doctrine, see Harlow, 457 U.S. at 816-18, 102 S.Ct. at 2737-38, our analysis varies somewhat from that typically applied when reviewing a summary judgment disposition on grounds of an affirmative defense. Once a defendant asserts qualified immunity, "[t]he plaintiff carries the burden of convincing the court that the law was clearly established." Losavio, 847 F.2d at 645. More specifically, the plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred." Id. at 646. Plaintiff's burden cannot be met merely by identifying in the abstract a clearly established right and then alleging defendant violated that right. Id. at 645. To satisfy his burden, the plaintiff must make a more particularized showing--"[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
 
 
 10
 Once plaintiff has identified the clearly established law and the conduct that violated the law with sufficient particularity, the defendant then bears the burden as a movant for summary judgment of showing no material issues of fact remain which would defeat the claim of qualified immunity. Losavio, 847 F.2d at 646; Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir.1989). At this point we "consider in the light most favorable to the plaintiff all undisputed facts discernible from the pleadings and other materials submitted to supplement them by the time the motion for summary judgment is made." DeVargas v. Mason & Hanger-Silas Mason Co., 844 F.2d 714, 719 (10th Cir.1988) (footnote omitted). "Our task ... is not to determine liability ... but to determine whether, on the basis of the pretrial record, there exists a conflict sufficiently material to defendants' claim of immunity to require them to stand trial." Id. This approach attempts to "balance the need to preserve an avenue for vindication of constitutional rights with the desire to shield public officials from undue interference in the performance of their duties as a result of baseless claims." Losavio, 847 F.2d at 645.
 
 
 11
 We now examine the record before us, using the described analysis.
 
 A. § 1983
 
 12
 Patrick asserts distinct violations of his First and Fourteenth Amendment rights actionable under 42 U.S.C. § 1983.[1] First, he alleges Defendants' conduct deprived him of his property interest in continued employment without due process of law, in violation of the Fourteenth Amendment. Second, Patrick alleges he was terminated in violation of the First Amendment for expressing opposition to discriminatory employment practices based on race and for expressing concerns regarding perceived illegalities in the City's budgeting process. We examine each allegation individually to determine whether Patrick has shown that Defendants' alleged conduct violated the law and that the law was clearly established when the alleged violations occurred.
 
 Due Process
 
 13
 General due process principles are beyond dispute--the Fourteenth Amendment prohibits a state from depriving a person of property without due process of law. Thus, it has long been established that an employer cannot deprive an employee of a legitimate claim of entitlement to continued employment without due process. See Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The essence of procedural due process is fair play; hence, the fundamental due process requirement "is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). This requirement includes three elements: 1) an impartial tribunal; 2) notice of charges given a reasonable time before the hearing; and 3) a pretermination hearing except in emergency situations. Miller v. City of Mission, 705 F.2d 368, 372 (10th Cir.1983).
 
 
 14
 These clearly established principles are insufficient, however, to defeat Defendants' Motion for Summary Judgment on grounds of qualified immunity. In order to maintain his claim, Patrick must go beyond these generalities to convince this court 1) he had a clearly established property interest in continued employment with the City at the time of the alleged wrongful discharge, Graham v. City of Oklahoma City, 859 F.2d 142, 145 (10th Cir.1988), and 2) a material issue of fact remains as to whether Defendants' conduct deprived him of due process.
 
 
 15
 Whether Patrick had a property interest in continued employment with the City of Norman is a question of state law. Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); Conaway v. Smith, 853 F.2d 789, 793 (10th Cir.1988). Oklahoma law recognizes "the terms of employment established by an employer ... may create a sufficient expectancy of continued employment to constitute a property interest, which must be afforded constitutionally guaranteed due process." Hall v. O'Keefe, 617 P.2d 196, 200 (Okla.1980). Furthermore, "[u]nder Oklahoma law, where certain terms of employee dismissals are explicitly stated in the city charter, the city manager or other city officials are not authorized to alter or otherwise restrict those terms so as to legally bind the city." Graham, 859 F.2d at 146. We agree with the district court that the converse is also true. Where a city charter restricts a city manager's authority to terminate employees, Oklahoma courts would not allow city officials to alter those terms so as to expand their authority to the detriment of employees. City employees therefore have a legitimate expectation of continued employment to the extent that a city charter limits its officials' power to terminate such employment.
 
 
 16
 Defendants Miller and Bloomberg assert the Norman City Charter is ambiguous and therefore could not confer a clearly established property interest in continued employment. They further contend Patrick had no property interest in continued employment because he was a probationary employee. See Walker v. United States, 744 F.2d 67, 68 (10th Cir.1984). Although Patrick denies ever being a probationary employee, he asserts the City Charter unambiguously allows termination only on the basis of merit, regardless of employment status. We agree with Patrick.
 
 
 17
 The Norman City Charter vests the City Manager with the power to appoint and dismiss City employees "at pleasure." However, the Charter also provides that "such appointments and removals shall be made upon the basis of merit and fitness alone." Notably, this provision makes no distinction between permanent and probationary employees. We find the restriction unambiguous.
 
 
 18
 The question remains, however, as to what effect Oklahoma courts would give the phrase "upon the basis of merit and fitness alone." Although Oklahoma courts have not yet reviewed this specific language, the Oklahoma Supreme Court has ruled that public employees subject to termination solely "for the good of the service" do not have a property interest in their continued employment. Hall, 617 P.2d at 200; see also Rains v. City of Stillwater, 817 P.2d 753, 756 (Okla.Ct.App.1991). On the other hand, Oklahoma courts specifically recognize a property interest in public employment when the employment terms provide that an employee may not be discharged without "cause". Id.; Vinyard v. King, 728 F.2d 428, 432 (10th Cir.1984); Poolaw v. City of Anadarko, 660 F.2d 459, 464 (10th Cir.1981) (citing Umholtz v. City of Tulsa, 565 P.2d 15, 23 (Okla.1977)). The language "for the good of the service" implies that an employer has a great deal of discretion and may terminate an employee simply to suit his own needs. The language before us is not so liberal. As with "for cause" provisions, a provision that authorizes removal based on "merit and fitness alone" implies the necessity for a showing of some degree and type of employee fault. Thus, we conclude the terms of the Norman City Charter gave Patrick a legitimate expectation of continued employment amounting to a property interest that was entitled to due process protection. We must next determine whether Patrick has made a sufficient showing Defendants' conduct denied him such protection.
 
 
 19
 As mentioned, due process protection provides, at minimum, an impartial tribunal, reasonable notice, and, absent exigent circumstances, a pretermination hearing. Miller, 705 F.2d at 372. Patrick alleges denial of the first element of due process--an impartial tribunal. "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing." Miller, 705 F.2d at 372.
 
 
 20
 In support of his allegation, Patrick presented evidence that both the pretermination hearing and the post-termination appeal were tainted by bias. For example, George Shirley, the City Personnel Director who served as hearing officer during Patrick's pretermination hearing, testified during deposition that Defendant Bloomberg instructed him to advertise for Patrick's replacement prior to the pretermination hearing. Shirley also testified he was given a prepared memorandum finding that Patrick should be terminated. Shirley felt coerced into approving Patrick's termination because he thought his own job might be jeopardized by finding in Patrick's favor. Thus, he approved the termination although he disagreed with it. In addition, Patrick's post-termination appeal was conducted by Defendant Miller, who, after the Retirement Board meeting, stated that Patrick should be fired.
 
 
 21
 Defendants boldly assert this evidence reveals nothing to suggest they "coerced" the hearing officer. They further assert an appeal was not constitutionally mandated, and therefore any impartiality by Defendant Miller is irrelevant. To the contrary, we find Patrick's evidence sufficient to demonstrate a genuine issue of material fact as to whether Defendants' conduct denied Patrick an unbiased tribunal. Thus, Defendants are not entitled to qualified immunity with regard to Patrick's due process claim.
 
 First Amendment
 
 22
 "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). Determining whether a governmental employer has infringed upon an employee's First Amendment rights requires a case-by-case, two-part analysis: First, we must determine if the speech was on a matter of public concern; and second, we must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968); see also Considine v. Board of County Comm'rs, 910 F.2d 695, 698-99 (10th Cir.1990); Melton v. City of Oklahoma City, 879 F.2d 706, 727 (10th Cir.1989).
 
 
 23
 Defendants suggest this case-by-case First Amendment analysis cannot be reconciled with the Harlow requirement that the law be "clearly established" before the defense of qualified immunity can be defeated. They argue that "[b]ecause no 'bright-line standard' puts the reasonable public employer on notice of a constitutional violation in the First Amendment arena, the employer is entitled to immunity." We have found the application of competing First Amendment/qualified immunity principles difficult, but not impossible:
 
 
 24
 Harlow is intended as a shield against liability but cannot become an insuperable barrier; therefore, public officials lose immunity in the face of clearly established law. However, because a rule of law determined by a balancing of interests is inevitably difficult to clearly anticipate, it follows that where Pickering balancing is required, the law is less likely to be well established than in other cases. We believe that except for case-by-case analysis and application, the rule cannot be better stated than in Harlow itself with careful consideration of its underlying principles.
 
 
 25
 In some circumstances, the fact-specific nature of the Pickering balancing may preclude a determination of "clearly established law," thereby giving rise to qualified immunity under Harlow.... We believe that the approach we adopt gives proper consideration to the concerns which prompted the Supreme Court to recognize qualified immunity, while it protects individuals from unprincipled behavior by a public employee's supervisors acting under color of law.
 
 
 26
 Melton, 879 F.2d at 729. We now apply these principles, de novo, to the facts of the present case to determine whether Patrick's speech addressed matters of public concern, and, if so, whether the protected nature of his speech was sufficiently clear that Defendants should have known the City's interests would not survive a balancing inquiry.
 
 
 27
 Patrick alleges he was terminated in retaliation for two incidents of protected speech: 1) expressing views critical and in opposition to the discriminatory employment practices of each of the defendants and in support of black female employees; and 2) expressing concerns over use of City retirement funds to balance the City budget.
 
 
 28
 Patrick's statements in opposition to discriminatory employment practices were made as a result of his awareness that one of his subordinates, Franklin, a black woman supervisor in the print shop, felt she had been discriminated against by Defendant Bloomberg. Franklin's discrimination claim arose from Bloomberg's decision to only allow Franklin out-of-pocket gas expense on a conference trip, rather than mileage reimbursement as provided by the Personnel Manual. Patrick supported Franklin's position in meetings with Defendants Bloomberg and Miller, the affected employees and the City Attorney. Patrick's statements were first made in the context of attempting to resolve the issue "in house." However, when that attempt proved unsuccessful, Patrick informed Defendants of the pending complaint and reaffirmed his support of the discrimination complaint.
 
 
 29
 Speech touching on matters of public concern relates to "any matter of political, social, or other concern to the community," in contrast to "matters only of personal interest." Connick v. Myers, 461 U.S. 138, 146-47, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). This threshold inquiry is one of law, not fact, and requires us to consider "the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48, 103 S.Ct. at 1690 (footnote omitted). Paying heed to these standards, we hold that Patrick's statements in opposition to alleged discriminatory employment practices constituted speech on a matter of public concern.
 
 
 30
 Defendants analogize the present case to Noyola v. Texas Dept. of Human Resources, 846 F.2d 1021 (5th Cir.1988). In Noyola, the plaintiff-employee made a statement to his supervisor suggesting the existence of a large welfare case load and urging a realignment of his own case load. The only evidence as to the content, nature and circumstances of this statement derived from the plaintiff's affidavit. Based on this scant evidence, the Fifth Circuit concluded that the plaintiff's speech was not protected because it amounted to nothing more than the airing of an internal grievance with his supervisor. Id. at 1024.
 
 
 31
 While the precise content of Patrick's statements is not disclosed by the record, the evidence presented is sufficient to distinguish this case from Noyola. In the present case, Patrick was not addressing concerns relating to employment practices which affected him directly. Rather, he was speaking in support of other employees. In addition, the record indicates Patrick voiced his opposition to the discriminatory practices and his support for his black co-worker on a number of occasions and in the presence of numerous individuals. Contrary to Defendants' assertion, Patrick's statements cannot be characterized simply as a personal grievance or an internal personnel matter. The disclosure and attempted remediation of racially discriminatory employment practices is better characterized as a matter of social concern to the community.
 
 
 32
 In Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 413, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979), the Supreme Court held that First Amendment protection applies when a public employee communicates privately with his employer instead of expressing his views publicly. Referring to the Givhan decision in Connick, the Court stated that "[a]lthough the subject matter of Mrs. Givhan's statements was not the issue before the Court, it is clear that her statements concerning the School District's allegedly racially discriminatory policies involved a matter of public concern." Connick, 461 U.S. at 146, 103 S.Ct. at 1689. Likewise, we find Patrick's statements to City officials concerning allegedly racially discriminatory employment policies addressed a matter of public concern. Moreover, because Connick was published in 1983, both the structure of the public concern inquiry and the protected nature of Patrick's speech were clearly established at the time Defendants terminated Patrick.
 
 
 33
 Patrick's statements expressing concern over the use of retirement funds to balance the City budget were made at a public Retirement Board meeting. As trustee of the retirement fund and chairman of the Retirement Board, Patrick raised the issue with board members after first trying unsuccessfully to meet with Bloomberg and Miller. Applying the "public concern" standards enumerated above, we hold that Patrick's statements expressing concern over perceived illegal budgeting activities constituted speech on a matter of public concern.
 
 
 34
 "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matter of public import." Conaway, 853 F.2d at 796. Although Conaway was decided contemporaneously with Patrick's alleged wrongful termination, this Circuit and most others have applied this same rule for many years. See, e.g., McKinley v. City of Eloy, 705 F.2d 1110 (9th Cir.1983); Key v. Rutherford, 645 F.2d 880 (10th Cir.1981). In other words, courts customarily focus on whether speech "was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties" when deciding whether speech qualifies as a matter of public concern. Koch v. City of Hutchinson, 847 F.2d 1436, 1445 (10th Cir.), cert. denied, 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).
 
 
 35
 Patrick's statements concerning potential illegalities in the City budget process most certainly addressed a matter of political and social concern to the community. These statements, which were made during a public meeting of the Retirement Board, did not address internal policies relevant only to City personnel; nor did they address essentially a private matter. See Conaway, 853 F.2d at 796. Furthermore, nothing in the record indicates Patrick's statements were motivated by personal interest or hostility. Rather, as trustee of the retirement fund, Patrick had a duty to inform Board members of what he perceived to be improper conduct. For these reasons, we find it was clearly established when Defendants terminated Patrick that his statements during the Retirement Board meeting would constitute protected speech.
 
 
 36
 Having thus concluded Patrick met his initial burden of showing the speech involved in both incidents was protected speech, we must now determine whether it was clearly established Patrick's interest in making those statements would outweigh Defendants' interest in the effective functioning of the City government. Wulf v. City of Wichita, 883 F.2d 842, 856 (10th Cir.1989).
 
 
 37
 Patrick's interest, as a citizen, in free comment upon matters of public concern--racially discriminatory employment policies and budgetary impropriety--is self-evident. "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." Connick, 461 U.S. at 145, 103 S.Ct. at 1689 (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982)). We therefore turn to Defendants' interest in " 'promoting the efficiency of the public services it performs through its employees.' " Rankin, 483 U.S. at 384, 107 S.Ct. at 2899 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1735).
 
 
 38
 A number of factors are considered in evaluating Defendants' interest under the Pickering balancing test. Pertinent considerations include "the manner, time, and place of the employee's expression ... the context in which the dispute arose ... [and] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388, 107 S.Ct. at 2899 (citations omitted). Applying these time-honored considerations which focus "on the effective functioning of the public employer's enterprise," id., we find Defendants should have known the City's interests would not survive a balancing inquiry.
 
 
 39
 Defendants make no assertion as to the effect of Patrick's statements regarding racial discrimination on the operation of City government. Defendants assert that Patrick's statements regarding the alleged inappropriate use of retirement funds to balance the City's budget were false, interfered with the operation of the budget process and openly discredited their integrity. The record, however, offers no support for these assertions--it discloses no evidence of interference with City operations, personnel relations or Patrick's job performance. Absent any particularized evidence of the Defendants' interest in this case, we must surmise that in light of the protected nature of Patrick's speech and the well-defined contours of the Pickering analysis, Defendants should have known their conduct in terminating Patrick would not survive a balancing inquiry.
 
 
 40
 In summary, Patrick has sufficiently established that his speech was constitutionally protected and that Defendants should have known their conduct would not survive First Amendment scrutiny. Moreover, Patrick's evidence raises a genuine issue of material fact as to whether his speech was a substantial or motivating factor in Defendants' decision to terminate him. Accordingly, Defendants are not entitled to qualified immunity from Patrick's First Amendment claim at this stage of the proceedings.
 
 B. § 1981
 
 41
 The district court found Plaintiff's § 1981 claim[2] was supported by this court's decision in Skinner v. Total Petroleum, Inc., 859 F.2d 1439 (10th Cir.1988). In Skinner we held that a white male plaintiff terminated from his employment for assisting a black co-worker with an EEOC claim, may bring an action under § 1981. Nonetheless, the district court granted Defendants' Motion for Summary Judgment on grounds of qualified immunity because "[u]ntil the Skinner decision was rendered on October 14, 1988 there was no clear authority in this circuit for allowing a white employee to bring a retaliation claim under Section 1981." Patrick v. City of Norman, No. CIV. 89-1084-R (W.D.Okla. Oct. 12, 1990). In other words, the district court granted Defendants' motion because "[t]he Plaintiff's Section 1981 rights were not clearly established at the time of the individual Defendants' actions."[3] Id.
 
 
 42
 On cross-appeal, Plaintiff contends this ruling is erroneous as "the district court utilized an incorrect standard in looking solely at whether there was 'clear authority in this circuit' to support Plaintiff's claim." Again, whether Plaintiff's rights were clearly established at the time Defendants terminated Patrick's employment is a question of law which we review de novo. Mitchell, 472 U.S. at 528-30, 105 S.Ct. at 2816-17; McEvoy, 882 F.2d at 465.
 
 
 43
 While the district court correctly determined Plaintiff could not rely on Skinner, and while Defendants accurately asserted that "[t]o date, the Supreme Court has not addressed the issue of whether a white person who is allegedly terminated for his efforts to support minorities in vindicating their rights is recognized under § 1981," we do not end our inquiry here. The law may be found to be clearly established by reference to decisions from other circuits. Walters v. Western State Hosp., 864 F.2d 695, 699 (10th Cir.1988). Moreover, "precise factual correlation between the then-existing law and the case at-hand is not required." Snell v. Tunnell, 920 F.2d 673, 699 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991). We consider the law to be "clearly established" when it is well developed enough to inform the reasonable official that his conduct violates that law. See Anderson, 483 U.S. at 640, 107 S.Ct. at 3039.
 
 
 44
 The principal beneficiaries of § 1981 have traditionally been racial minorities. However, federal courts have consistently broadened standing under § 1981. Beginning most decidedly with McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 296, 96 S.Ct. 2574, 2586, 49 L.Ed.2d 493 (1976), § 1981 has supported claims of racial discrimination against white as well as black individuals.[4] More directly on point, prior to Defendants' challenged conduct in the present case, the Second, Third, Fourth, Fifth, Sixth and Eleventh Circuit Courts of Appeals either expressly held that alleged discrimination against a white person because of his association with black persons states a cause of action under § 1981 or allowed such claims without specifically addressing the issue. DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 312 (2d Cir.) (§ 1981 suit allowed where white employee alleged his company forced him to retire because he sold his house to a fellow black employee), modified on other grounds, 520 F.2d 409 (2d Cir.1975); Liotta v. National Forge Co., 629 F.2d 903, 906-07 (3d Cir.1980) (summary judgment inappropriate where material issues of fact remain regarding § 1981 claim brought by plaintiff allegedly discharged because he espoused the rights of company's black employees), cert. denied, 451 U.S. 970, 101 S.Ct. 2045, 68 L.Ed.2d 348 (1981); Fiedler v. Marumsco Christian Schl., 631 F.2d 1144, 1149 (4th Cir.1980) (private sectarian school prohibited under § 1981 from terminating a contractual relationship with a white student because of her association with a black schoolmate); Pinkard v. Pullman-Standard, a Div. of Pullman, Inc., 678 F.2d 1211, 1229 (5th Cir.1982) (retaliatory discharge claim allowed under § 1981 where evidence showed plaintiff was discharged for lawful advocacy of minority and union rights), cert. denied, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 954 (1983); Alizadeh v. Safeway Stores, Inc., 802 F.2d 111, 114 (5th Cir.1986) (white plaintiff maintained a § 1981 claim alleging discrimination because of marriage to a non-white); Winston, 558 F.2d at 1270 (plaintiff had standing under § 1981 to sue alleging retaliatory discharge for protesting the alleged discriminatory firing of a black co-worker); Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 890 (11th Cir.1986) (white plaintiff maintained a § 1981 claim alleging discrimination because of marriage to a non-white). The remaining circuit courts had not considered the issue; therefore, no split of authority obscured the law in this area.[5]
 
 
 45
 The above referenced cases were sufficient to inform a reasonable government official in 1988 that retaliatory actions against a white employee because of his efforts to defend the rights of racial minorities may violate the employee's rights as enumerated in § 1981. Thus, we hold, as a matter of law, that Patrick's right to sue under § 1981 was "clearly established" at the time Miller and Bloomberg terminated his employment.
 
 
 46
 Our inquiry does not end here, however. In order to defeat Defendants' Motion for Summary Judgment, Patrick must present facts and allegations sufficient to demonstrate Defendants' conduct violated a right protected by § 1981--facts and allegations demonstrating discriminatory interference with Patrick's right to make or enforce a contract. After reviewing the record, we conclude Patrick has presented evidence sufficient to establish the essential elements of his § 1981 claim.
 
 
 47
 First, Patrick alleges Defendants were motivated by racial animus. Racial animus is an element necessary to support a discrimination claim under § 1981. General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). In his First Amended Complaint, Patrick, a white male, asserts he was fired in retaliation for his support of a black co-worker who filed a racial discrimination complaint against the City. The deposition testimony of City Personnel Director George Shirley and City Attorney Jeff Raley supports this allegation. Shirley stated he believed Patrick was terminated because of his support for black employees. Raley advised Patrick it would not be in his best interest to continue to help the co-worker with her discrimination complaint. Moreover, the timing of Patrick's first and only formal evaluation suggests the possibility of pretext. This evidence is sufficient to raise a genuine issue of material fact as to Defendants' motive in terminating Patrick. Defendants' evidence that Patrick was terminated for unsatisfactory work performance--an evaluation form dated July 15, 1988, which in essence declares that "[Patrick's] demonstrated management style has not been consistent with what is expected of the management team"--is insufficient for this court to conclude, as a matter of law, that Patrick would have been terminated in the absence of any racial motive.
 
 
 48
 Second, Patrick alleges that Defendants Miller and Bloomberg denied him his right under § 1981 to make and enforce an employment contract. This court, relying on the language and reasoning of the United States Supreme Court in Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), has held that a discriminatory discharge claim is not actionable under § 1981. Trujillo v. Grand Junction Regional Center, 928 F.2d 973, 975-76 (10th Cir.1991).[6] However, a racially discriminatory failure to promote is actionable under § 1981 if "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer." Patterson, 491 U.S. at 185, 109 S.Ct. at 2377. Patrick's employment status is therefore crucial to the legitimacy of his § 1981 claim.
 
 
 49
 The record indicates that Patrick may have been denied a "promotion." Defendants, relying on the City Charter, the Norman Personnel Handbook and references by Patrick himself in a letter dated August 16, 1988, contend Patrick was an "at will" and probationary employee who was denied "permanent employee status." The Personnel Handbook makes clear that permanent employees have rights, privileges and benefits not available to probationary employees. Therefore, by Defendants' own evidence, the change from probationary to permanent employment status drastically alters the relation between the employee and the employer. This evidence supports Patrick's § 1981 claim. For purposes of his § 1983 claim, however, Patrick denies he was a probationary employee by asserting he had a property interest in continued employment. Based on this evidence, we find a disputed issue of material fact exists as to Patrick's employment status. Accordingly, Defendants are not entitled to qualified immunity from Patrick's § 1981 claim at this stage of the proceedings.
 
 III. CONCLUSION
 
 50
 As we have shown, Plaintiff has sufficiently identified his clearly established rights under 42 U.S.C. §§ 1981 and 1983. Plaintiff has also presented facts and allegations sufficient to show Defendants' conduct may well have violated those rights. Defendants, on the other hand, have failed to satisfy their burden as movants for summary judgment--they have failed to show that no material issues of fact remain which would defeat their claim of qualified immunity.
 
 
 51
 Therefore, the district court's October 12, 1990 order denying Defendants' Motion for Summary Judgment on grounds of qualified immunity with respect to Plaintiff's § 1983 claim is AFFIRMED. However, that same order is REVERSED insofar as it granted Defendants' Motion for Summary Judgment on grounds of qualified immunity with respect to Plaintiff's § 1981 claim. Accordingly, we REMAND for further proceedings consistent with this opinion.
 
 
 
 [1]
 42 U.S.C. § 1983 provides:
 Any person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
 
 
 [2]
 42 U.S.C. § 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 [3]
 The conduct upon which Plaintiff's § 1981 claim is based occurred no later than September 9, 1988, the date of Millers' ruling on appeal
 
 
 [4]
 In 1969 the United States Supreme Court granted standing to a white lessor to sue a community recreation corporation because of his expulsion from the corporation for assigning his membership interest to his black lessee. Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). The plaintiffs in Sullivan filed their action pursuant to both §§ 1981 and 1982. Although the Court's precise holding was limited to § 1982, some courts have considered the Court's reasoning equally applicable to a § 1981 claim. See Skinner, 859 F.2d at 1447 (citing Winston v. Lear-Siegler, Inc., 558 F.2d 1266 (6th Cir.1977))
 
 
 [5]
 Defendants cite one district court case, Van Hoomissen v. Xerox Corp., 368 F.Supp. 829 (N.D.Cal.1973), as conflicting authority. This case was decided prior to McDonald, however, and is no longer persuasive authority
 
 
 [6]
 The Civil Rights Act of 1991 was enacted, in part, to overrule restrictive case precedent and to give effect to Congress' intended broad scope of civil rights protection in the employment context. Civil Rights Act of 1991, Pub.L. No. 102-166, § 3 (1991). The 1991 Civil Rights Act specifically amended § 1981 to include protection against discriminatory termination of an employment contract. Id. § 101. However, it is neither necessary nor appropriate for us to discuss the potential applicability of this new legislation given the present posture of this case