**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 16 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

RON WILLIAMSON,

      Plaintiff-Appellant,

v.

CITY OF EDMOND,

      Defendant-Appellee.

No. 98-6462
(D.C. No. 98-CV-206-L)
(W.D. Okla.)

**ORDER AND JUDGMENT** *

Before **BALDOCK** , **PORFILIO** , and **BRORBY** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

*    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Ron Williamson was terminated from his position as a fire marshal for the City of Edmond for using a profane epithet toward a coworker. In response, he brought this action pursuant to 42 U.S.C. § 1983 against the City alleging that the City terminated his employment in violation of his rights to free speech and due process guaranteed by the First and Fourteenth Amendments of the Constitution. On cross-motions for summary judgment, the district court determined that the speech for which Williamson was terminated was not protected by the First Amendment and that his due process rights were not violated. Accordingly, it granted summary judgment in the City's favor. Williamson appeals. We review the district court's grant of summary judgment de novo. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 120 S. Ct. 53 (1999).

Because this appeal arises from a grant of summary judgment, we view the facts, and draw inferences, in the light most favorable to Williamson. *See id.* At the time of his termination, Williamson was the City's fire marshal, a high-ranking position immediately beneath the fire chief, and he had worked for the City's fire department for twenty-one years. The fire department is unionized, and over the course of his employment, Williamson had made his anti-union sentiments known to his coworkers. [1] On December 23, 1997, Williamson was at

_____

[1]     Williamson was not a member of the union, but apparently was covered
                                                          (continued...)

-2-

one of the City's fire stations and entered the office of Captain Charles Owen to show him some photographs from a recent fire. Two other individuals, assistant chief Arnie Postier and firefighter David Billen, were also in or near Owen's office. While Williamson was in Owen's office, the subject of a new union contract came up. In his deposition, Williamson explained what occurred as follows:

A. So I went in to show him the photographs. And as I was showing them to him, he pulled the contract, the pay plan. Everyone knew that I was displeased with it. [2]

. . .

Q. All right, and when you were in his office, you said he had a copy of the pay plan?

A. Apparently. He pulled the thing over and said, did you see how much we're making or I don't recall the exact words, but something to that effect, how much money, the raise that I got.

Q. Did you get a raise as a result of the contract?

A. Yes, I did.

Q. Okay. And what did you say?

---

[1](...continued)
under the union contract.

[2]    Williamson had earlier explained that he did not like the pay plan in the union contract because firefighters were paid more than their direct supervisors and because a captain working in the fire suppression command made more than a major in his command, which was fire prevention.    *See* Appellant's App. Vol. I at 129-30.

A.  I said oh gosh, I've seen it.

Q.  And go ahead and tell me what else happened.

A.  There was a bit of a snicker, look at this money, I make more than, I make as much as you do or some comments to that effect.

Q.  This is what Charles Owen said?

A.  Yes.

Q.  Tell me, as best you can, exactly what he said to you at that time.

A.  Again, I don't recall because to me it wasn't important.  It wasn't something that would come up later.  I had made no, I have no recollection of exactly what he said.  But it was something to the effect of hey, look at this, how much money we're making.  Look how much money I get.

And being irritated over the thing, I said well yeah, of course, you union people.  And then we had a brief discussion about unions and I said well, you're just a bunch of--I love firemen individually, I said but collectively as a group, and forgive me for the language, but I said you're a bunch of communist cock suckers.

And I assume he took that very offensively and Arnie Postier was there.  And I asked him--I don't recall.  That was the comment that Charlie took offensively.

Appellant's App. Vol. I at 132-33.

After learning about the incident from a statement prepared by Owen, fire department chief Dwight Maker discussed the incident with city manager Leonard Martin and human resources director Roberta Smith.  Maker, Martin and Smith decided that some type of disciplinary action would be appropriate, and Smith notified Williamson of a "pre-determination hearing" to be held on January 8,

-4-

1998, "to determine whether a recommendation for termination or another form of discipline should be made to the City Manager." *Id.* at 403. The notice indicated that the hearing would be informal, stated that Williamson had a right to be represented, and told him to be prepared to present information regarding the allegations made against him for "[i]ndulging in verbal and offensive conduct towards City employees [and c]reating an intimidating, hostile and offensive working environment among employees in the Fire Department." *Id.* The decisionmakers at the hearing were Maker and Smith, and Williamson appeared without representation. No one else appeared. Following the hearing, Maker and Smith recommended to city manager Martin that Williamson be terminated for the reasons stated in the hearing notice. Martin accepted their recommendation and terminated Williamson effective January 12, 1998.

Williamson then filed this action. He contends that his speech--calling Owen a communist cocksucker [3]--while concededly profane, was nonetheless on a matter of public concern because he was generally speaking about unions, and therefore his speech was protected by the First Amendment. He also contends that the City deprived him of his property interest in continued employment and his liberty interest in preserving his reputation without due process. In particular,

---

[3]     Williamson has indicated alternatively that he directed his epithet at Owen in particular and/or union members in general. For purposes of our analysis, it does not matter whether he was referring only to Owen or to all union members.

he contends that the city did not provide an impartial tribunal at his hearing because Maker and Smith were biased against him and in favor of the union and Owen. He also contends that he was denied his right to cross-examine the witnesses (Owen, Postier and Billen) who gave statements against him. Finally, he claims that his reputation was stigmatized because the City disseminated damaging information published on local newspapers regarding his termination.

The district court rejected Williamson's First Amendment claim on the basis that his speech was about a matter of only private concern--the amount of money he was being paid--rather than about a matter of public concern. Alternatively, the court held that even if his speech could be considered to be addressing a matter of public concern, the speech was disruptive to the fire department, and the City's interest in the effective operation of its fire department outweighed any interest that Williamson had in expressing his dissatisfaction with the pay plan through personal invective. Regarding his due process claims, the court determined that he had a protected property interest in continued employment that was subject to due process protections. It then found that he had not demonstrated that Maker or Smith were impermissibly biased decisionmakers and concluded that due process did not require that he be allowed the right to cross-examine the individuals who made statements against him. The court also concluded that he did not state a valid liberty interest claim because he had not

shown that any City official had made any statement regarding his termination, much less a false one.

## First Amendment Claim

A government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). "Thus, a public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech." *Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998). Our analysis of Williamson's claim begins with determining whether he engaged in protected speech, and the first step in that analysis is to determine whether his speech addressed a matter of public concern. *See Connick*, 461 U.S. at 146; *Dill*, 155 F.3d at 1201. Whether speech is protected is a question of law. *See Connick*, 461 U.S. at 148 n. 7; *Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1211 (10th Cir. 1998).

"Matters of public concern are those of interest to the community, whether for social, political or other reasons. Matters solely of personal interest to government employees, however, are not protected by the First Amendment." *Dill*, 155 F.3d at 1202 (citation omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461

U.S. at 147-48.  The employee's motive--that is, "whether the speaker's purpose was to bring an issue to the public's attention or to air a personal grievance"-- is important to this determination.  *See Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995).  Williamson contends his speech was "on the subject of Union matters[, and] Labor Unions and their activities are, without question, matters of public concern."  Appellant's Br. at 13;  *see also id.* at 14-18 (identifying evidence indicating that conversation was "about" or "concerning" the union).

We reject Williamson's general contention that speech commenting "on the subject of Union matters" is, by itself, enough to make it a matter of public concern.  While matters involving labor unions may be of some public interest, to be protected, speech must do more than just generally relate to a matter of public interest; it must also be sufficiently informative to be useful to the public in evaluating government conduct.  *See Moore*, 57 F.3d at 932.  Thus, "[i]n order for a public employee's speech to be of public concern, . . . it is not always enough that its *subject matter* could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest.  What is actually said on that topic must itself be of public concern."  *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir. 1988) (en banc) (quotation and citations omitted; emphasis in original).

Turning to what Williamson actually said, we note initially that the record does not support his claim he stated that "he believed the contract was a waste of tax payer's money and that the citizens of Edmond should know what the contract provided." Appellant's Br. at 11. While he did state generally in his deposition that this was his view, and such speech might be considered a matter of public concern, *see, e.g.*, *Curtis*, 147 F.3d at 1212 (exposing improper operations of government generally matter of public concern), there is no evidence that he made any similar statement in his conversation with Owen.

What the evidence does show is that he was "irritated" by the pay plan and, in particular, by the fact that Owen earned as much as he did, *see* Appellant's App. Vol. I at 133 (Williamson's deposition); that he might institute some type of lawsuit against the union "to make them pay for what they had done to him," *see id.* at 81 (Billen's statement), 78 (Owen's statement); and that he personally was treated unfairly by the latest contract negotiation, *see id.* at 81 (Billen's statement). These comments concerning his personal salary and treatment by the union cannot reasonably be seen as being on matters of public concern; they illustrate only his personal dissatisfaction with the union contract and union members. Moreover, even were we to consider his more general "irritation" with or opposition to the pay plan, due to what he claims is the unfair treatment of supervisors generally and his command in particular, we would view this not as a

matter of public concern, but only a matter relating only to internal operations of the fire department. *See David v. City & County of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996) ("[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern.").

We therefore agree with the district court that Williamson failed to demonstrate that his speech was on a matter of public concern.[4] Because his free speech claim fails on that basis, we need not address the district court's alternative holding regarding the balancing of the parties' interests.

### Due Process Claims [5]

---

[4] Like the district court, we do not consider the fact that Williamson's speech contained the profane epithet for which the City terminated him, but instead look to the content of his expression. *Cf. Rankin v. McPherson*, 483 U.S. 378, 387 (1987) ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."). Williamson's heavy emphasis in his brief on *Cohen v. California*, 403 U.S.15 (1971), where the Court found the phrase "Fuck the Draft" on a jacket worn in a public place to be protected speech, is therefore irrelevant. Moreover, *Cohen*, which involved a restriction on the public's rather than an employee's right to speak, does not support Williamson's claim, as the Court has since noted that "we have never expressed doubt that a government employer may bar its employees from using Mr. Cohen's offensive utterance to members of the public or to the people with whom they work." *Waters v. Churchill*, 511 U.S. 661, 672 (1994) (plurality opinion).

[5] In its response brief on appeal, the City adopted the parts of the district court's order rejecting Williamson's due process arguments rather than providing any appellate argument itself. Williamson contends that in light of this failure to

(continued...)

-10-

The district court determined, ironically, that the union contract gave Williamson a property interest in his continued employment by requiring that he could be disciplined only for just cause, and that he therefore was entitled to due process before he could be terminated. *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted). Citing *Melton v. City of Okla. City*, 879 F.2d 706, 721 (10th Cir. 1989), *modified in part on other grounds on reh'g en banc*, 928 F.2d 920 (10th Cir. 1991), Williamson argues that in this situation, the process he was entitled to included "(1) an impartial tribunal; (2) notice of the charges; (3) a pre-termination hearing; and (4) the right to confront and cross-examine one's accusers." Appellant's Br. at 30. He claims he was not provided the first and last of these requirements.

Williamson contends that the tribunal, comprised of fire chief Maker and human resources director Smith, was not impartial because Maker is Owen's brother-in-law and past business partner, Maker talked to Owen about the incident

---

[5](...continued)
rebut his appellate arguments, we must reverse the district court and order that summary judgment be granted in his favor on his due process claims. While we believe the City's appellate strategy to be very ill-advised, *see Hernandez v. Starbuck*, 69 F.3d 1089, 1094 n.3 (10th Cir. 1995), Williamson's contention that we are obligated to reverse the district court's judgment is incorrect, *see id.* at 1093-94.

before the hearing, and Smith's son and daughter are both union members working for the City. He also contends that Maker made up his mind before the hearing that Williamson should be terminated, as did city manager Martin, who approved the termination.

An impartial tribunal, that is, one not "biased with respect to the factual issues to be decided at the hearing," is an integral part of due process. *Patrick v. Miller*, 953 F.2d 1240, 1245 (10th Cir. 1992) (quotation omitted). However, "'[b]ecause honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated.'" *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 518 (10th Cir. 1998) (quoting *Mangels v. Pena*, 789 F.2d 836, 838 (10th Cir. 1986)). We agree with the district court that Williamson has failed to make the "substantial showing," *see id.*, necessary to overcome the presumption. He has presented no evidence of actual bias, and the familial and past business relationships are inadequate to show bias on their own. Maker (and Martin) stated that they were inclined, based on what they knew at the time, toward termination prior to the hearing, but this does not make them incapable of rendering an impartial judgment. *See Withrow v. Larkin*, 421 U.S. 35, 47-49, 55 (1975) (fact that same individuals who investigated later adjudicated charges brought as a result of investigation, without more, does not

-12-

show lack of impartial tribunal); *Mangels*, 789 F.2d at 838. Contrary to Williamson's contention, Maker stated that he did not finally decide that Williamson should be terminated until after the hearing. We thus reject his claim that the tribunal was biased against him.

Williamson also claims he was denied his right to cross-examine the individuals who gave statements against him. While cross-examination is often considered one of the procedures necessary for due process, *see, e.g.*, *Tonkovich*, 159 F.3d at 517-18; *West v. Grand County*, 967 F.2d 362, 369 (10th Cir. 1992), [6] we conclude that Williamson has not shown that he was denied due process here. Nothing in the record indicates that he ever asked for the opportunity to cross-examine his accusers, nor is there any indication that the City prohibited him from doing so, or would have denied his request if he had made one. *See id.* (finding no violation of due process resulting from lack of cross-examination where plaintiff did not request witness's presence at hearing and there was no suggestion she was restricted from doing so). Moreover, he has not attempted to explain what cross-examination here would have accomplished. *See Meder v. City of Okla. City*, 869 F.2d 553, 555 (10th Cir. 1989) (finding no denial of due

[6] Cross-examination is generally considered a due process requirement at full-blown *post*-termination hearings. *See, e.g.*, *Tonkovich*, 159 F.3d at 517-18. The hearing about which Williamson complains was a *pre*-termination hearing. The parties do not explain whether there was any post-termination process available to Williamson. We conclude he has not shown he was denied due process regardless of the timing of the hearing.

-13-

process where plaintiff failed to show "how confrontation and cross-examination would have changed" the result of the hearing). Williamson has not identified what facts were in dispute, and, indeed, admitted using the profanity aimed at Owen for which he was terminated. Under these circumstances, Williamson cannot complain of his inability to cross-examine the individuals who gave statements against him.

Finally, Williamson contends that the district court erred in rejecting his claim that the City denied him his liberty interest in his reputation without due process. To prevail on a liberty interest claim, Williamson had to prove the publication of a defamatory statement tending to jeopardize employment opportunities. *See, e.g.*, *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994). Critically, he had to prove that the City published the allegedly defamatory statement. *See Tonkovich*, 159 F.3d at 526; *cf. id.* at 518 (noting that § 1983 itself contains causation requirement). The district court rejected this claim because the evidence showed that only Williamson himself, and not any City officials, publicized any statements regarding his termination. Williamson does not argue that the court erred in its assessment of the evidence, and we will not make his argument for him. *See Hernandez*, 69 F.3d at 1093.

## Conclusion

The district court correctly held that Williamson had not demonstrated that his speech was protected by the First Amendment, or that the City had denied him his right to due process. Accordingly, the district court properly granted summary judgment to the City.

AFFIRMED.

Entered for the Court


Bobby R. Baldock
Circuit Judge