Sabrina PIKE, Plaintiff,

v.

**Ray GALLAGHER, Robert Rohlfs, Ted Drennan, Michael Harpster, William Rehm, John W. Higgins, In Their Individual and Official Capacities, Bernalillo County Sheriff's Department, Defendants.**

Civ. No. 91–0891 JB.

United States District Court,
D. New Mexico.

July 28, 1993.

As Amended Oct. 8, 1993.

Stephen T. LeCuyer, Mettler & LeCuyer, Albuquerque, NM, for plaintiff.

Robert C. Gutierrez, Virginia Anderman, Miller, Stratvert, Torgerson & Schlenker, Albuquerque, NM, for defendants.

## MEMORANDUM OPINION
## AND ORDER

BURCIAGA, Chief Judge.

THIS MATTER is before the Court on the motion of Defendants Ray Gallagher, Robert Rohlfs, Michael Harpster, William Rehm, Ted Drennan and Bernalillo County Sheriff Department for summary judgment as to all counts of Plaintiff Sabrina Pike's amended complaint. Plaintiff brought her claims under 42 U.S.C. § 1983 and state law wrongful discharge for damages she claims she suffered when Defendants allegedly terminated her employment in violation of her rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. Having reviewed the pleadings, the evidence of record, the relevant law, and having heard the arguments of counsel, the Court finds Defendants' motion is well taken in part and will be granted in part.

### I. FACTS

On August 15, 1988, Defendant Bernalillo County Sheriff's Department (Department) hired Plaintiff as a deputy sheriff. On October 13, 1989, she was assigned to the Department's Field Services Division as a vice detective. Sometime after October 13, 1989, Plaintiff alleges she began investigating a lead that officers within the Department, including supervisory officers, were receiving illegal payments. These payments were allegedly coming from illegal "lotion" or "massage" parlor businesses in the Albuquerque area. The payments were made to officers who "tipped" the establishments of possible raids by the Department.

Plaintiff claims she informed Sergeant William Rehm, in a private conversation before October 1, 1990, of the possible corruption within the Department. Plaintiff further alleges that after she turned over the investigation to the FBI, she had a meeting with Undersheriff Joe Bowdich, Chief Deputy Robert Rohlfs, and Captain Dan Houston. At this meeting Plaintiff claims she divulged the individuals' names, their descriptions, and the dollar amounts involved in the investigation. Part of the investigation involved deputies Michael Disney and Darryl Burt, who were allegedly picked out of a photo array by a confidential informant in the presence of Plaintiff. The informant also stated that the "boss of Disney" was receiving illegal payments. Plaintiff claims she narrowed

the "boss of Disney" down to four individuals: Lieutenant Richard Sawin, Lieutenant Larry Stapleton, Sergeant Richard Scott and Rohlfs.

Plaintiff claims that after she made these statements she was involuntarily transferred to the Narcotics Unit on October 1, 1990. After her transfer, she was required to sign a form consenting to random drug testing. The Department further ordered Plaintiff to cease all her ongoing investigations in the Vice Unit.

On Friday May 10, 1991, Plaintiff had an argument with an informant with whom she worked. On the same day, Plaintiff informed her immediate supervisor, Lieutenant Michael Harpster, that she no longer wished to work with this informant. Several hours later, Harpster claims he received a phone call from the informant who accused Plaintiff of smoking marijuana with her.

On May 13, 1991, Plaintiff reported to work and was informed that she and the rest of the Narcotics Unit[1] must submit to a urinalysis test. Sheriff Ray Gallagher ordered the urinalysis testing on the advice of Harpster and Rehm. On May 17, 1991, Plaintiff's test came back positive for marijuana and cocaine use. After being informed of the positive result, Plaintiff notified Captain Ted Drennan and requested a retest as called for under the Department guidelines. The Department performed the retest on the same urine sample which once again came back positive for marijuana and cocaine use.

On her own volition, Plaintiff submitted a urine sample to Lovelace Medical Center, an independent health care center, on May 14, 1991. She submitted another sample to the same facility on May 21, 1991. On May 24, 1991, she submitted a third sample to a medical facility in Freona, New Mexico. All three samples came back negative for both cocaine and marijuana use.

On May 31, 1991, Rehm prepared a notice of pending disciplinary action alleging that an Internal Affairs investigation had been authorized and commenced into Plaintiff's use

of marijuana with a confidential informant on May 3, 1991. In the notice Rehm recommended that Plaintiff be fired. Drennan, Gallagher, Harpster and Rohlfs agreed with the recommendation.

On June 6, 1991, at approximately 3 p.m. Harpster notified Plaintiff to be present at 9 a.m. on June 7, 1991, for her "pre-determination" hearing. She had not yet received the written notice of the disciplinary action against her. Plaintiff's former attorney called Gallagher to complain about the short notice of the hearing. He claims Gallagher rejected his objection to the short notice, stating that the hearing was a "mere formality." On June 7, 1991, a pretermination hearing was held in Gallagher's office. On June 11, 1991 Gallagher terminated Plaintiff on behalf of the Department.

Gallagher personally delivered the May 31, 1991, notice of pending disciplinary action to Plaintiff on June 11, 1991. Plaintiff filed a grievance with the Department on June 14, 1991, seeking review of the decision. The post-termination hearing was held between June 24 and June 27, 1991. The hearing board (Board) of Sergeant Richard Scott, Sergeant Bruce Ford, and Deputies Derrly Smith, Jennifer Iskow, and Jack Jones rejected Plaintiff's request that the confidential informant be present to testify and that the Board's decision be by secret ballot. The Board upheld the termination decision of Gallagher on June 27, 1991.

■ A motion for summary judgment may be granted only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), and as a matter of law, must show entitlement to summary disposition beyond a reasonable doubt. *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir.1980); *Madison v.*

---

**1.** The Narcotics Unit consisted of Plaintiff, defendants Rehm and Harpster and five other deputies.

*Deseret Livestock Co.,* 574 F.2d 1027, 1037 (10th Cir.1978). The Court must view the record in a light most favorable to the existence of triable issues. *Exnicious v. United States,* 563 F.2d 418 (10th Cir.1977).

It may appear prosaic, but the Court finds it necessary to address Defendants' claims of qualified immunity separately since they have properly raised issues involving qualified immunity under each of Plaintiff's constitutional claims. Therefore, the Court will first address whether Plaintiff has raised material issues of fact, as to her constitutional claims, and then will separately address Defendants' claims of entitlement to qualified immunity.

## II. FOURTH AMENDMENT CLAIM

■ Defendants claim the May 13, 1991, urinalysis test was a random urinalysis test that was consistent with the Supreme Court's decisions in *Skinner v. Railway Labor Exec. Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Plaintiff contends the urinalysis of the Narcotics Unit was ordered because of the allegations of drug use against Plaintiff and, therefore, was not random.

*Skinner* and *Von Raab* upheld random urinalysis testing of railroad and United States Customs Service employees under the Fourth Amendment. The Court stated that "special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable." *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414; *Von Raab,* 489 U.S. at 665, 109 S.Ct. at 1390. The Court held that the strong public interest in safety outweighed the limited intrusions on the employees in both instances. *Skinner,* 489 U.S. at 621–22, 109 S.Ct. at

1415–16; *Von Raab,* 489 U.S. at 671–72, 109 S.Ct. at 1393–94. In finding that the tests were "reasonable" in light of the public interest versus the private intrusion, the Court strongly emphasized that the tests were defined "narrowly" and "specifically," *Skinner,* 489 U.S. at 622, 109 S.Ct. at 1416, and that the "covered employee is simply not subject 'to the discretion of the official in the field.'" *Von Raab,* 489 U.S. at 667, 109 S.Ct. at 1391 (quoting *Camara v. Municipal Court,* 387 U.S. 523, 532, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967)).

The Court need not determine if *Skinner* and *Von Raab* applies to sheriff deputies such as Plaintiff,[2] *see Ford v. Dowd,* 931 F.2d 1286, 1289 (8th Cir.1991); *Fraternal Order of Police v. Tucker,* 868 F.2d 74 (3d Cir.1989); *but see Jackson v. Gates,* 975 F.2d 648 (9th Cir.1992), since the urinalysis test fails in the manner in which it was carried out. *Skinner,* 489 U.S. at 622, 109 S.Ct. at 1416; *Penny v. Kennedy,* 915 F.2d 1065, 1067 (6th Cir.1990) (en banc).

Rehm, along with Harpster, recommended the testing of the Narcotics Unit to Gallagher. Rehm stated in his deposition that he believed Plaintiff was the "catalyst" for the May 13, 1991, testing. Gallagher in his deposition stated he understood the urinalysis recommendation was due to the allegations against Plaintiff.

Even if Plaintiff was not the reason for the May 13, 1991, analysis, the Defendants would not be entitled to summary judgment because the Department's own regulations do not "specifically" and "narrowly" define the situations and manner in which employees are to be tested. *Skinner,* 489 U.S. at 622, 109 S.Ct. at 1416. The Defendants have submitted no guidelines which would suggest that Gallagher's urinalysis order complied with the demands of *Skinner.*[3] Therefore,

2. However, the rationale of *Von Raab* would appear to apply to all public employees who carry firearms or who work in drug interdiction.

3. Defendants have submitted Plaintiff's consent form to random drug testing, which states that any testing will be "a random unannounced test at the discretion of Command Personnel." They have also submitted Section 330.02 of the Department's Standard Operating Procedures,

which refers to a deputy's requirement to undergo "random urinalysis". However, that section does not define any guidelines limiting the discretion of the official who orders the search. Under Section 330.01 it states "only the sheriff may order such analysis" but does not define when, or how, the sheriff can so order.

the Department's procedures fail to guarantee that its urinalysis testing will be done on a random basis. *See Skinner,* 489 U.S. at 622, 109 S.Ct. at 1416; *Jackson,* 975 F.2d at 653; *Dowd,* 931 F.2d at 1289; *McDonell v. Hunter,* 809 F.2d 1302 (8th Cir.1987); *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir. 1986).

■ Defendants' next claim is that even if the test was not random, it was constitutional since they had a "reasonable suspicion" to test Plaintiff. *See Dowd,* 931 F.2d at 1289; *Tucker,* 868 F.2d at 77. Defendants claim the informant was "extremely reliable" and that the informant wished no monetary compensation for the information. Harpster and Rehm corroborated the informant's story. They determined the informant and Plaintiff were in a sheriff's vehicle late in the evening of May 3, 1991, and this was when Plaintiff allegedly smoked marijuana with the informant.

Plaintiff claims the only fact in possession of the Defendants at the time of the urinalysis was that an informant, who worked with the Plaintiff, had claimed to have smoked marijuana with Plaintiff in a Department vehicle. Plaintiff claims that at the time of the urinalysis, the reliability of the informant was unknown and none of the informant's factual allegations had been corroborated.

"Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). "[T]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence." United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1969) (emphasis in original)); *see also White,* 496 U.S. at 331–32, 110 S.Ct. at 2416–17; *Jackson,* 975 F.2d at 650–53.

Harpster and Rehm stated in their depositions they had no reason to "believe or disbelieve" the informant's accusation. Harpster stated in his deposition that when he talked with the informant on May 10, 1991, the informant "never brought up" the fact of the dispute between Plaintiff and the informant earlier in the day. Harpster stated he talked to the informant for "about five minutes" on May 10, 1991. Further, after talking with the informant, Harpster stated he had no information which would credit or discredit the informant's allegations. Rehm was also aware of the fact Plaintiff no longer wished to work with the informant at the time the informant made the accusation. Further, Rehm stated that when he first heard of the allegations from Harpster, he did not believe them. Neither Rehm or Harpster had ever witnessed any conduct on the part of Plaintiff which would lead them to suspect drug usage. Finally, it is unclear if the Defendants were aware of the reliability of the informant before the May 13, 1991, testing.

The Court finds there are genuine issues of material fact as to what information the Defendants possessed at the time of the May 13, 1991, testing and whether this information rises to a level of reasonable suspicion.

■ Defendants' final contention is that Plaintiff consented to the May 13, 1991, urinalysis. Defendants rely on Plaintiff's signing of a consent form which they claim is consistent with the test given. They also rely on her voluntarily taking the urinalysis of May 13, 1991, as validating her consent. Plaintiff claims that she went through with the urinalysis test on May 13, 1991, because she thought she "had to do it." Further, Plaintiff contends she signed the consent form under the belief that any testing was to be conducted at "random."

■ "[A] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Defendants have the burden of proving that Plaintiff "freely and voluntarily" gave her consent to the May 13, 1991, test. *Id.* Mere "acquiescence to a claim of lawful authority", *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968), is not sufficient to prove consent. *Schneckloth,* 412 U.S. at 233, 93 S.Ct. at 2050.

Upon transferring to the Narcotics Unit, Plaintiff was required to sign a consent form to random drug urinalysis. The form stated in part that:

I hereby understand that upon being accepted into the Narcotics Investigative Unit ... I can, at any time, be ordered to submit myself for analysis of bodily fluids, i.e. blood, urine, etc., for the purpose of detecting the possible usage of illegal drugs. I further understand that this will not necessarily be the result of any suspicious illegal use, but will be a random unannounced test at the discretion of Command Personnel.

■ Defendants first argue that since Plaintiff consented, on October 15, 1990, to a drug test given at the "discretion of Command Personnel," *Skinner* and *Von Raab* do not apply. This is a novel and altogether frivolous argument in light of Supreme Court precedent to the contrary. Employment cannot be conditioned upon the waiver of a constitutional right. *See Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Frost Trucking Co. v. Railroad Comm.,* 271 U.S. 583, 593–94, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926). A transfer within employment, whether voluntary or involuntary, should not be treated any differently than the initial hiring phase. *See Von Raab,* 489 U.S. at 679, 109 S.Ct. at 1398. In *Von Raab,* the Court found that the testing "triggered" by applications for promotion within the United States Customs Service to certain positions was reasonable under the Fourth Amendment. *Id.* If promotions or transfers within employment did not fall under the *Pickering* and *Frost* prohibitions, there would have been no need to decide *Von Raab.*

Defendants' second argument is that Plaintiff consented to the test on May 13, 1991, when she voluntarily submitted to the urinalysis. Defendants have not met their strict burden in proving Plaintiff waived her Fourth Amendment rights when she submitted to the May 13, 1991, analysis. *Schneckloth,* 412 U.S. at 222, 93 S.Ct. at 2045; *United States v. Guglielmo,* 834 F.2d 866, 868 (10th Cir.1987). Defendants have shown "no more than acquiescence [by Plaintiff] to a

claim of lawful authority." *Bumper,* 391 U.S. at 548–49, 88 S.Ct. at 1792. This is not sufficient to prove consent. *Id.* at 548–49, 88 S.Ct. at 1792; *Schneckloth,* 412 U.S. at 233, 93 S.Ct. at 2050. Therefore, the Court must address the individual Defendants' claim based on qualified immunity.

■ Defendants' qualified immunity claim is premised on their belief that reliance on the consent form to test was "objectively reasonable," that Harpster and Rehm could have objectively believed they had reasonable suspicion to recommend the search, and that Gallagher acted reasonably in relying on the recommendation of Harpster and Rehm. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ The individual defendants are not entitled to qualified immunity if the "facts or allegations [are sufficient] to show both that the defendant's alleged conduct violated the law and that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Centers Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988).

Plaintiff's Fourth Amendment right was "clearly established" in May, 1991. *See supra.* In light of the Supreme Court's precedent in *Schneckloth, Bumper, Pickering,* and *Frost* (consent); *Skinner,* and *Von Raab* (random drug testing); and *White, Cortez,* and *Terry* (reasonable suspicion), and viewing the facts in the light most favorable to Plaintiff, *Celotex,* no reasonable officer could have believed the recommended search of Plaintiff was lawful. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039. Therefore, the Court denies Defendants' motion for summary judgment.

## III. THE EXCLUSIONARY RULE

■ Although the parties did not brief the issue, the Court finds that Plaintiff's claims compel the Court to rule on the applicability of the exclusionary rule in the public employment context. Defendants contend the sole reason for Plaintiff's termination was the positive drug result. Since the drug test may have been unconstitutional, the issue

that remains is to what extent can Plaintiff seek compensation for damages attributable to a Fourth Amendment violation. If the exclusionary rule does not apply in the employment termination context, then Plaintiff is not entitled to any damages which are a result of the Defendants' use of the unconstitutional evidence.[4] This of course would also limit Plaintiff's substantive due process challenge. She would not be able to claim that the use of the alleged unconstitutional drug test, to uphold Plaintiff's termination, violated her substantive due process rights. *See infra*, part VII, substantive due process.

The exclusion of relevant evidence, unconstitutionally acquired, in a noncriminal proceeding is not novel to our constitutional jurisprudence.[5] The Supreme Court has recognized that the leading case on search and seizure, *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), was itself not a criminal case. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). In *Plymouth Sedan*, 380 U.S. at 698, 85 S.Ct. at 1249, the Court made it clear that evidence obtained in violation of the Fourth Amendment cannot be used to sustain a forfeiture proceeding. The Court noted that the forfeiture of the vehicle was an action taken to punish for the criminal violation involved. *Id.* at 700, 85 S.Ct. at 1250.

In *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the Court held the exclusionary rule did not prohibit the Internal Revenue Service from using evidence illegally seized by the Los Angeles Police Department in a civil tax assessment. In *Janis*, the Court held the societal costs of excluding unlawfully seized evidence from federal civil proceedings outweighs the sufficient likelihood of deterring the conduct of state police officers. *Janis*, 428 U.S. at 454, 96 S.Ct. at 3032 (citing *United States v. Calandra*, 414 U.S. 338, 94

S.Ct. 613, 38 L.Ed.2d 561 (1974)). Therefore, the exclusionary rule does not prohibit the use of illegal evidence in a civil proceeding by a sovereign which was not involved in violating the Constitution in obtaining the evidence. The Court left open the question, which is currently before this Court, of whether the exclusionary rule would apply in a civil proceeding against an "intrasovereign" violation of the Fourth Amendment. *Janis*, 428 U.S. at 455 n. 31, 96 S.Ct. at 3033 n. 31.

In *INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), the Court applied the balancing test in *Janis* in holding that the exclusionary rule does not apply to "intrasovereign" violations of the Immigration and Naturalization Service. The Court recognized the deterrent effect of the exclusionary rule is greater in cases of "intrasovereign" violations. *Lopez–Mendoza*, 468 U.S. at 1043, 104 S.Ct. at 3485. However, the Court stated there were many factors on the cost side of the balance which were not before the Court in *Janis*. *Id.* at 1043, 104 S.Ct. at 3485.

The most important factor in *Lopez–Mendoza* was that the INS had developed its own rules to guard against violating the Fourth Amendment rights of individuals legally in this country. *Id.* Another factor which was not before the Court in *Janis* was the fact that "applying the exclusionary rule in proceedings that are intended not to punish past transgressions but to prevent their continuance or renewal would require the courts to close their eyes to ongoing violations of the law." *Id.* at 1046, 104 S.Ct. at 3487. The Court also noted that immigration judges, and attorneys who practice before them, are not well-versed in Fourth Amendment law. *Id.* at 1048, 104 S.Ct. at 3488. Further, civil deportation proceedings are streamlined hearings to resolve primarily factual and not legal issues. The Court also recognized the factual problems which would arise if a bor-

---

4. Of course Plaintiff would still be entitled to recover damages for the unconstitutional search itself.

5. In *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the Court stated that "[i]n the complex and turbulent history of the rule, the Court never has applied it to ex-

clude evidence from a civil proceeding, federal or state." However, buried in a footnote at the end of this statement the Court did concede that the exclusionary rule has been applied "in a proceeding for forfeiture of an article used in violation of the criminal law." *Id.* at 447 n. 17, 96 S.Ct. at 3028 n. 17.

der patrol agent had to testify as to whether an individual's Fourth Amendment rights were violated in a mass arrest situation. *Id.* at 1049–50, 104 S.Ct. at 3488–89.

In *Savina Home Indus. v. Secretary of Labor,* 594 F.2d 1358, 1363 (10th Cir.1979), the court stated that the exclusionary rule would be applicable to an administrative hearing under the Occupational Safety and Health Act (OSHA). The court found that the exclusionary rule was applicable in civil cases which could be characterized as "quasi-criminal." *Id.* at 1362. The court distinguished *Janis,* finding the deterrent purpose of the exclusionary rule is furthered by suppressing unconstitutionally seized evidence by an OSHA inspector in an OSHA administrative proceeding. *Id.* at 1362–63.

Under current Supreme Court and Tenth Circuit precedent, the Court believes it is bound to apply the exclusionary rule in an employment termination proceeding, if the proceeding can be characterized as "quasi-criminal" [6] and if the invocation of the rule will outweigh the costs to society under *Janis,* 428 U.S. at 454, 96 S.Ct. at 3032.

"Quasi-criminal" proceedings have been defined generally as actions which provide for punishment but are civil rather than criminal in form. *See Savina Home,* 594 F.2d at 1362 n. 6. In *Powell v. Zuckert,* 366 F.2d 634, 640 (D.C.Cir.1966), the Court found that Government discharge proceedings are "quasi-criminal" in nature in holding that the exclusionary rule applies in civil employment termination proceedings. *Powell* is the only Court which has addressed the applicability of the exclusionary rule in employment termination proceedings. Further, there can be no doubt that Plaintiff's termination, for testing positive for drugs, was to penalize her for violating the law. *Plymouth Sedan,* 380 U.S. at 700, 85 S.Ct. at 1250. An on duty sheriff's deputy would be a danger to society if she was under the influence of drugs. *See Von Raab,* 489 U.S. at 670, 109 S.Ct. at 1393. However, there would appear to be no logical

distinction between a deputy who was intoxicated by drugs and a deputy who was intoxicated by alcohol. Indeed, there appears to be no Department regulations to systematically test deputies for alcohol use. It appears clear to this Court, therefore, that a distinction is being made, not upon any increase in harm by using drugs instead of alcohol while on duty, but rather, by the fact that drug use, in and of itself, is against the law. Accordingly, the Court finds Plaintiff's termination hearing was "quasi-criminal" in nature.

The Court having found the employment termination proceeding in question was "quasi-criminal" in nature, the Court must balance the likely deterrent effect versus the societal costs in applying the exclusionary rule under the facts before the Court.

■ The need to deter unconstitutional random drug testing should be self evident. A random urinalysis, by its very nature, will subject "innocent" employees to a highly intrusive search. *See Lopez–Mendoza,* 468 U.S. at 1045, 104 S.Ct. at 3486 (recognizing the important concerns of the constitutional rights of innocent Hispanic–Americans). Moreover, unlike probable cause and reasonable suspicion, there are no subjective factors a government official must consider before requiring employees to undergo random urinalysis. Consequently, in most random urinalysis constitutional challenges, much like Plaintiff's allegations here, the constitutional violation will not be a mere "constable's blunder" but an egregious violation of the Fourth Amendment. *See Lopez–Mendoza,* 468 U.S. at 1050, 104 S.Ct. at 3489 (plurality opinion). Finally, unlike *Janis* and *Lopez–Mendoza,* the random urinalysis may only be used in the civil context. *See Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414 (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (recognizing that the Court has carved out exceptions to the warrant and probable cause requirement when "special needs, beyond the normal need

---

**6.** It is unclear if the Supreme Court requires a threshold finding that the nature of the civil proceeding is "quasi-criminal", *see Janis,* 428 U.S. at 447 n. 17, 96 S.Ct. at 3029 n. 17, or if the nature of the proceeding is merely one factor in

applying the *Janis* balancing test. *Lopez–Mendoza,* 468 U.S. at 1038, 104 S.Ct. at 3483 ("A deportation proceeding is a purely civil action....").

for law enforcement, make the warrant and probable cause requirement impracticable.")). Department officials are not deterred by the potential fear that administering an unconstitutional random urinalysis test would jeopardize a criminal investigation since a random urinalysis test, even when constitutionally administered, would still be impermissible in a criminal prosecution. *See Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414; *Von Raab,* 489 U.S. at 665, 109 S.Ct. at 1390. Thus, the sole purpose the Department administered the urinalysis test was to detect drug use, by one of its deputies, and to use that evidence in a termination proceeding. *See Lopez–Mendoza,* 468 U.S. at 1053, 104 S.Ct. at 3489 (White, J., dissenting) (quoting *Janis,* 428 U.S. at 458, 96 S.Ct. at 3034) ("Thus, unlike the situation in *Janis,* the conduct challenged here falls within 'the offending officer's zone of primary interest.' ").

On the societal cost side of the balance, this case is more analogous to *Janis* than *Lopez–Mendoza.* There is no evidence before the Court that the Department has a comprehensive regulatory scheme to protect their employees' Fourth Amendment rights. *Lopez–Mendoza,* 468 U.S. at 1044, 104 S.Ct. at 3486. There also is no comparable "streamlined" hearing system to handle the numerous, but simple, burden of proof and factual issues. *Id.* at 1048, 104 S.Ct. at 3488. Even without factual questions of whether the drug test should have been suppressed, the termination proceeding lasted three days. Unlike the Court's concern in *Lopez–Mendoza,* the determination of whether a random drug urinalysis is constitutional is fairly straight forward. *Id.* at 1048–49, 104 S.Ct. at 3488–89. There also can be no contention that police officers, who serve on the Board, are not well-versed in Fourth Amendment law. *Id.* Accordingly, the application of the exclusionary rule in employment termination proceedings will not undermine the primary purpose of those hearings. *Id.*

The costs to society would appear to be limited to the exclusion of otherwise relevant evidence that an employee is using drugs, and is therefore subject to termination. However, an employee who tests positive for drugs yet successfully proves the test was unconstitutional, is not free from all potential discipline. In fact, any discipline based on the unconstitutional test which is not characterized as "quasi-criminal" would not invoke the exclusionary rule. This would include suspension with pay, a change in position or job duties, enrollment and completion of a drug treatment program, etc.

The Court holds that the *Janis* balancing test tips in favor of applying the exclusionary rule to an unconstitutional random drug analysis in employment termination proceedings, and, therefore, the Court must discuss the individual Defendants' entitlement to qualified immunity.

■ The issue before the Court is whether a reasonable police officer, or official, should have known that using unconstitutional, but relevant, evidence in an employee post-termination proceeding was in violation of the exclusionary rule. *See Pueblo Neighborhood,* 847 F.2d at 646. The Court finds that a reasonable police official would not have known that using the results of Plaintiff's drug test, to justify Plaintiff's termination, would violate the exclusionary rule.

The Court in *Janis* specifically stated that it was not addressing the issue which is now before the Court. *Janis,* 428 U.S. at 455–56 n. 31, 96 S.Ct. at 3033 n. 31. However, in *Garcia v. Miera,* 817 F.2d 650, 656 (10th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), the Court held that Tenth Circuit precedent is dispositive on the issue of whether a law is "clearly established." The issue then, is whether *Savina Home* clearly established that the exclusionary rule applies to employment termination proceedings.

The Tenth Circuit in *Savina Home* stated "we believe the exclusionary rule would be applicable to OSHA proceedings involving inspections violative of the warrant requirements...." *Savina Home,* 594 F.2d at 1363. *Savina Home* based its holding on finding that the Court's decision in *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (holding that nonconsensual OSHA inspections undertaken without warrants violate the Fourth Amendment), was not to be applied retroactively. *Id.* at 1363. The Court held that retroactive appli-

cation of the exclusionary rule would not serve its deterrent function. *Id.* at 1364. Although the court stated that applying *Barlow's* retroactively would have no practical significance without finding that the exclusionary rule applies to administrative hearings, the court did not hold that the exclusionary rule applied. *Id.* at 1361–63. Further, *Savina Home* was decided before the Court's decision in *Lopez–Mendoza,* 468 U.S. at 1042, 104 S.Ct. at 3485, which held that the exclusionary rule did not apply to "intrasovereign" violations in civil deportation proceedings.

The Court holds that the applicability of the exclusionary rule was not "clearly established" under Tenth Circuit precedent in civil proceedings. Therefore, a reasonable police official would not have known that the use of illegally obtained evidence could not be used in employment termination proceedings.

## IV. FIRST AMENDMENT CLAIM

Defendants claim that there are no genuine issues of material fact as to whether Plaintiff was terminated for exercising her First Amendment rights. They also claim that, independent of any First Amendment retaliation claims, Defendants' termination decision was reasonable based on the positive drug test. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Setliff v. Memorial Hospital,* 850 F.2d 1384 (10th Cir.1988). Plaintiff claims the urinalysis test and her termination allegedly based on a positive drug result was pretextual. She claims she was tested and terminated in retaliation for comments she made which are protected by the First Amendment. *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

■■■■ "It is clearly established that a state may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin,* 483 U.S. at 383, 107 S.Ct. at 2896 (citing *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972)). The determination of whether an employee's speech is protected in the employment context requires "a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2897 (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). The first part of the balance requires Plaintiff to show that her speech was a "matter of legitimate public concern. . . ." *Connick,* 461 U.S. at 145, 103 S.Ct. at 1689 (quoting *Pickering,* 391 U.S. at 571, 88 S.Ct. at 1737).

■■■ In *Patrick v. Miller,* 953 F.2d 1240 (10th Cir.1992), the court held that "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matter of public import." *Id.* at 1247–48 (quoting *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988)). Once Plaintiff has established her speech was a matter of public concern, the burden shifts to the Defendants to establish an important interest, as an employer, which outweighs Plaintiff's interest as a citizen in commenting on a matter of public concern. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899; *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691; *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

■■■ Important considerations the Court has weighed in the past involve whether the speech impairs discipline; its detrimental impact on working relationships; its impediments on the speaker's performance of her duties; and its interference with the regular operation of the enterprise. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899 (citing *Pickering,* 391 U.S. at 570–73, 88 S.Ct. at 1735–37). If Plaintiff's interest in commenting on matters of public concern is not outweighed by the interest of Defendants as an employer, Plaintiff's speech is protected by the First Amendment.

■■■ Plaintiff then has the burden of proving that her protected speech was the "motivating" or "substantial" factor behind the reason to terminate her. *Mt. Healthy,*

429 U.S. at 287, 97 S.Ct. at 576. If Plaintiff meets her burden, Defendants can still avoid liability if they can prove, by a preponderance of the evidence, that the termination decision would have been made in any event. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691.

Defendants have not disputed that Plaintiff had at least two separate conversations with Department officials discussing the alleged corruption within the Department. *Patrick*, 953 F.2d at 1247–48 (evidence of corruption are matters of public concern); *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899 (private conversations are protected by the First Amendment). Consequently, the Court finds that Plaintiff's speech was on a matter of public concern. The burden now shifts to Defendants to prove a legitimate interest, as an employer, which outweighs Plaintiff's interest in commenting on alleged corruption within the Department.

On the record before the Court there is no evidence that the statements were made outside of the two private conversations with her superiors. Her speech did not interfere with her duties since her very duties as a police officer (and as a vice officer) were to investigate criminal activity. While the Court recognizes that allegations of corruption within a police department would tarnish its image and would be disruptive to some extent (especially to the officers involved), this could not justify the retaliation Plaintiff alleges here. *See, e.g., Conaway*, 853 F.2d at 798. Therefore, Defendants have not met their burden that Plaintiff's right to speak out on matters of public concern was outweighed by any interest Defendants have as an employer and thus Plaintiff's speech is protected by the First Amendment.

Plaintiff has also raised genuine issues of material fact that her termination was substantially motivated by her protected speech. Plaintiff's evidence consists of her sudden transfer out of the Vice Unit, and the circumstances surrounding the May 13, 1991, drug testing. Plaintiff has claimed that other deputies had been accused of drug use, and other serious crimes, and the Department never took any affirmative action. In fact, the testimony before the Court is that no one could remember if the Department had ever before conducted a urinalysis test of its deputies. Defendants admit that the May 13, 1991, drug urinalysis was ordered at least in part, if not solely, because of the accusations against Plaintiff. Further, Plaintiff's three negative test results, one taken the day after the May 13, 1991, urinalysis, and the fact that Defendants cannot provide a "chain of custody" of her urine sample raise material issues of fact that there may have been tampering.

Finally, Defendants have mischaracterized the affirmative defense burden under *Mt. Healthy*, 429 U.S. at 285–86, 97 S.Ct. at 575. It is not enough to state that the positive drug test gave the Department "sufficient" reason to terminate Plaintiff regardless of any unconstitutional motivation. Once Plaintiff proves her termination was substantially motivated by her protected speech, it will be Defendants' burden to prove that Plaintiff *would* have been terminated, not merely that she *could* have been terminated for testing positive for drugs. *Rankin*, 483 U.S. at 380, 107 S.Ct. at 2894 (Plaintiff was probationary employee who could have been fired for any reason); *Mt. Healthy*, 429 U.S. at 285, 97 S.Ct. at 575 (non-tenured teacher who could have been fired); *Perry*, 408 U.S. at 597–98, 92 S.Ct. at 2697–98 (non-tenured professor with no contractual rights to being rehired). Plaintiff has raised genuine issues of material fact that other deputies, under similar circumstances, would not have been terminated by Defendants.

The Court finds Plaintiff has raised genuine issues of material fact the Defendants violated her First Amendment rights, and now the Court must address the individual Defendants' claim of qualified immunity.

The individual Defendants argue that qualified immunity is appropriate because a reasonable police official could have believed that the positive drug test was a sufficient reason to terminate Plaintiff regardless of any unconstitutional motivation by the Defendants. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691; *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. Defendants argue that the Court should apply a qualified im-

munity analysis to Defendants' affirmative defense under *Mt. Healthy*. Qualified immunity, however, is only appropriate to "determine whether [plaintiff's] speech addressed matters of public concern, and, if so, whether the protected nature of [her] speech was sufficiently clear that defendants should have known the [Department's] interests would not survive a balancing inquiry." *Patrick*, 953 F.2d at 1246.

As discussed *supra*, Plaintiff's speech on corruption within the Department is on a matter of public concern. *Patrick*, 953 F.2d at 1247–48; *Conaway*, 853 F.2d at 798. Defendants have not submitted any legitimate reasons, as an employer, which would outweigh Plaintiff's interest to speak out on alleged corruption within the Department.

The Court finds that no reasonable police official could have believed that the Department's interests as an employer would outweigh Plaintiff's interest as a citizen. *Melton v. City of Oklahoma City*, 879 F.2d 706, 722 (10th Cir.1989), *rev'd on other grounds*, 928 F.2d 920 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991). Therefore, the Court denies Defendants' motion for summary judgment.

## V. PROCEDURAL DUE PROCESS (LIBERTY)

Defendants claim Plaintiff has not met her burden in establishing a liberty violation and, even if Plaintiff has met her burden in making a liberty claim, she was provided with all the procedures a liberty interest guarantees.[7] Plaintiff argues she has stated a liberty claim which was violated by Defendants' denial of her request to cross-examine the informant and the pretextual nature of the pre-termination hearing.

"The liberty interest concept recognizes two particular interests of a public employee: (1) protection of [her] good name, reputation, honor and integrity, and (2) freedom to take advantage of other employment opportunities." *Walker v. United States*, 744 F.2d 67, 69 (10th Cir.1984) (citing *Miller v. City of Mission*, 705 F.2d 368, 373 (10th Cir.1983)). To make a sufficient claim of a liberty interest, an employee must establish the following elements: (1) that the charges of dishonesty or immorality were made during the termination decision or proceedings; (2) they must have been made public; and, (3) they must be false. *Melton*, 928 F.2d at 926. Further, public statements are not stigmatizing, as a matter of law, *Southeast Kansas Community Action Program v. Secretary of Agriculture*, 967 F.2d 1452, 1458 (10th Cir.1992), unless the statements have the potential to damage Plaintiff's standing or associations in the community and her freedom to take advantage of future employment opportunities. *Melton*, 928 F.2d at 927.

The charges of lying and drug use, especially by a sheriff deputy, are the type of "stigmatizing" statement which gives rise to a liberty interest in procedural due process. *See Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (dishonesty or immorality); *Walker*, 744 F.2d at 69 (falsifying an employment form); *McGhee v. Draper*, 564 F.2d 902, 911 (10th Cir.1977) (statements questioning fitness to be a teacher). The charges of drug use, lying and smoking marijuana in a Department vehicle were raised during the termination proceedings. Plaintiff has disputed her use of drugs and the charge that she smoked marijuana with a police informant in a Department vehicle. *Melton*, 928 F.2d at 926 (quoting *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) ("[T]here must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation.")). Therefore, if the charges were made public Plaintiff has raised a liberty interest claim. *Melton*, 928 F.2d at 927.

---

**7.** There is no dispute between the parties that Plaintiff has a property interest in her job. Therefore, Plaintiff was entitled to procedural due process whether she can prove a liberty violation or not. However, Plaintiff's ability to prove a liberty violation could substantially affect the amount of damages she may be able to recover for a due process violation. *Carey v. Piphus*, 435 U.S. 247, 262, 98 S.Ct. 1042, 1051, 55 L.Ed.2d 252 (1978) (no presumed compensatory damages for a procedural due process violation).

Plaintiff claims that the newspaper article, printed in the Albuquerque Journal on Friday, May 24, 1991, meets the requirement that the stigmatizing statements be made public. The newspaper article states that Gallagher confirmed Plaintiff had been placed on administrative leave. The story also states Gallagher refused to give any reasons for the Department's actions. The article claims "other sources" said that Plaintiff was tested for drug use after a complaint by a police informant. These facts are not in dispute between the parties and, therefore, cannot be the basis for a liberty claim. *Codd,* 429 U.S. at 627, 97 S.Ct. at 884; *Melton,* 928 F.2d at 926. However, based on the article, the logical inference regarding Plaintiff's suspension after a drug test would be that Plaintiff tested positive for drugs. Consequently, Plaintiff has raised genuine issues of material fact the false charges were made public.[8] Further, the "other sources" mentioned in the article must have come from within the Department since it would appear that only Department officials would have been aware of the urinalysis testing and the suspension of Plaintiff.

The Court finds there are genuine issues of material fact as to Plaintiff's liberty claim, and, therefore, the Court denies Defendants' motion for summary judgment.[9]

## VI. PROCEDURAL DUE PROCESS (PROPERTY)

The parties do not dispute that Plaintiff could have only been discharged for "just cause" and therefore she had a property right in her continued employment which procedural due process recognizes. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S.

532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Thus, the issue before the Court is what process was Plaintiff due.

Defendants claim they are entitled to summary judgment on Plaintiff's claim that she was denied due process during her pretermination and post-termination hearings. Defendants argue Plaintiff had notice of the charges and evidence against her before the pretermination hearing; that she received all the process she was due; and, therefore, Defendants are entitled to summary judgment as a matter of law. *Loudermill,* 470 U.S. at 532, 105 S.Ct. at 1488. As to her post-termination proceedings, Defendants claim there are no genuine issues of material fact to establish that the Board was biased against Plaintiff. Further, Defendants claim Plaintiff had no right to request the board vote by secret ballot or to cross-examine the informant *during the post-termination proceedings.* Plaintiff claims she was denied an adequate pretermination hearing. She specifically objects to the short notice she was given of the pretermination hearing and to the fact the hearing was pretextual. As to the post-termination hearing, she claims she was denied her due process rights to an impartial tribunal, her right to request the board's decision be made by secret ballot, and her right to cross-examine her accuser.

It has been settled for some time now that the "root requirement" of the Due Process Clause requires "some kind of a hearing" prior to the termination of an employee who has a property interest in her job. *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493. So long as there is a full post-termination evidentiary hearing, the pretermination hearing "need not be elaborate."

---

**8.** Plaintiff does not have to establish that the Defendants' statements were reported in the news media to prove they were made public. Any public recording is sufficient to give rise to a liberty claim. *See Goss v. Lopez,* 419 U.S. 565, 575, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975); *Walker,* 744 F.2d at 69.

**9.** The Tenth Circuit has not distinguished between the procedures required under liberty and property due process claims. *Melton,* 879 F.2d at 721. Therefore, the Court's discussion of Plaintiff's property due process claims, regarding her pretermination hearing and her right to cross-examine the informant, would also apply to

Plaintiff's liberty claim. However, as the Court has already stated, *see supra,* footnote 7, Plaintiff's ability to prove a liberty violation is only relevant as to the amount of damages Plaintiff may have suffered.

As an example, if Plaintiff proves her due process right to cross-examination was violated, then Plaintiff is entitled to recover one judgment for both her liberty and property due process claims. However, if Plaintiff proves she was entitled to liberty due process protection, she will be able to seek damages unique to her liberty interest claim.

*Id.* at 545–46, 105 S.Ct. at 1495. Basically, an employer has to provide an employee notice of the charges against her, an explanation of the employer's evidence, and a hearing to give the employee an opportunity to tell her side of the story before being deprived of her property interest in continued employment. *Id.* at 546, 105 S.Ct. at 1495.

The first requirement is met if the employee receives written or oral notice of the charges against her sometime before the hearing begins. *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495 (oral notice sufficient); *Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) ("There need be no delay between the time 'notice' is given and the time of the hearing."); *Panozzo v. Rhoads,* 905 F.2d 135, 139 (7th Cir.1990) (notice of a pretermination hearing the night before is sufficient). The second requirement is met if the employee is aware of the employer's evidence against her at the time of the hearing. *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495. The third requirement is met if the employee is given an opportunity to present her side of the story. *Id.* Implicit in this final requirement is that the hearing officer must not have already made up his mind to terminate the employee before hearing the employee's view of the events in question. *Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1494 ("[S]ome opportunity for the employee to present [her] side of the case is recurringly of obvious value in reaching an accurate decision."); *Goss,* 419 U.S. at 584, 95 S.Ct. at 741 (requiring "at least an informal give-and-take" to hedge against erroneous action).

While Plaintiff states she did not receive any formal written notice of the charges against her until June 11, 1991, Plaintiff did have notice that she was being put on administrative leave pending disciplinary action as early as May 17, the day her positive drug result was known. She was also aware of the accusations of the informant as of May 17, 1991. Therefore, at the time of the pretermination hearing of June 7, 1991, Plaintiff had oral notice of the charges against her and she was aware of her employer's evidence. She does not contend that she was not given an opportunity to explain her side of the story at the June 7, 1991, hearing. *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495; *Miller v. City of Mission,* 705 F.2d 368 (10th Cir.1983).

However, there are genuine issues of material fact of whether the pretermination hearing was pretextual. Plaintiff claims the night before the June 7, 1991, pretermination hearing, Plaintiff's former counsel contacted Gallagher to complain about the short notice. Gallagher allegedly rejected Plaintiff's request for more time stating that the "hearing was a mere formality." Gallagher remembers the conversation but does not remember making the above statement.

If this statement was made, it could merely reflect the fact that Gallagher (correctly) believed that a pretermination hearing can be an informal session. However, it might also be interpreted as meaning that the decision to terminate was already made and the hearing was just a legal formality. If the latter, then the hearing was not the sort of "informal give-and-take" due process requires. *Goss,* 419 U.S. at 584, 95 S.Ct. at 741.

There is evidence that Gallagher had already made his decision to terminate Plaintiff before the June 7, 1991, hearing. In a "Notice of Pending Disciplinary Action" memorandum written by Rehm to Plaintiff on May 31, 1991 (May 31 letter), Rehm recommended that Plaintiff be fired and stated that "[t]his Notice of Pending Disciplinary Action is to be reviewed through my chain of command, and you will be notified of a predetermination hearing, should this recommended action receive the concurrence of the Sheriff." Gallagher signed but did not date the May 31, letter.[10] One reading of this letter is that Gallagher concurred in Rehm's decision to terminate Plaintiff prior to the June 7, 1991, pretermination hearing. Moreover, the crux of Plaintiff's complaint is that Gallagher and the other Defendants terminated Plaintiff in retaliation for her statements regarding impropriety within the Department. Since the Court has found that Plaintiff has raised genuine issues of material

---

**10.** However, Rohlfs and Harpster both signed and dated the letter prior to June 7, 1991.

fact as to her retaliation claim, it would be inconsistent to find that the pretermination hearing was not pretextual in light of other evidence Plaintiff has presented on this issue. Therefore, the Court finds there are material issues of genuine fact as to whether the June 7, 1991, pretermination hearing violated Plaintiff's procedural due process rights.

Although Plaintiff's complaint presents only one count for a violation of her property right to procedural due process, encompassing both claims of pretermination and post-termination violations, the Court must still address Defendants' summary judgment motion as it applies to the alleged post-termination violations. *See Loudermill,* 470 U.S. at 547 n. 12, 105 S.Ct. at 1496 n. 12.

■■■■■ The Court first rejects Plaintiff's contention that the June 24–27 hearing was only a pretermination hearing. Plaintiff claims since she was paid up through the June 24–27, proceedings, she had not yet been deprived of any constitutionally protected interest, and, therefore, the hearing was a pre-termination hearing. *Schaper v. City of Huntsville,* 813 F.2d 709, 714 n. 5 (5th Cir. 1987). However, since termination became effective on June 11, 1991, if not before, *see supra,* the teachings of this circuit require this Court to treat the June 24–27, hearing as a post-termination proceeding. *Seibert v. Univ. of Oklahoma,* 867 F.2d 591, 597 (10th Cir.1989) (quoting *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493) ("It is settled that 'the root requirement' of the Due Process Clause is 'that an individual be given an opportunity for a hearing before [s]he is deprived of any significant property interest.' "); *Miller,* 705 F.2d at 372 ("Moreover, except in emergency situations, due process requires that the

hearing be held before, termination becomes effective.").[11]

Plaintiff's argument that she was denied her right to an impartial tribunal has two components. First, she claims Board Chairman Scott was biased against her. Second, she claims John Higgins not only presented the Department's case against Plaintiff, but also gave legal advice to the Board concerning this matter in violation of the prohibition against mixing the adjudication and prosecutorial functions. *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

■■■■■ The right to an impartial tribunal is a fundamental component of procedural due process. *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1669, 72 L.Ed.2d 1 (1982); *Patrick,* 953 F.2d at 1245. It is "absolute in the sense that it does not depend upon the merits of a claimant's substantive assertions . . . ." *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978). However, the Court must start by "presuming the hearing officer is not biased." *Schweiker,* 456 U.S. at 195, 102 S.Ct. at 1669 (citing *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)). Plaintiff has the burden to establish a "conflict of interest or some other specific reason for disqualification." *Schweiker,* 456 U.S. at 195, 102 S.Ct. at 1669. Plaintiff can meet her burden by establishing that the Board members have a "direct and substantial interest," which due process prohibits. *Ward v. Village of Monroeville,* 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972); *see also Aetna Life Ins. v. Lavoie,* 475 U.S. 813, 825–26 n. 3, 106 S.Ct. 1580, 1588 n. 3, 89 L.Ed.2d 823 (1986) (requiring the interest to be more than slight);

---

**11.** In *Schaper* the Court cited language in *Loudermill,* 470 U.S. at 544–45, 105 S.Ct. at 1494–95, to suggest that no significant deprivation occurs until pay stops. The Court believes the opinion in *Schaper* misinterpreted *Loudermill.*

*Loudermill* does not stand for the proposition that pay, and not termination, is the significant deprivation starting point. The language the *Schaper* court relies on only suggests that an employer, in narrow circumstances, could suspend an employee with pay if it would create a "significant hazard in keeping the employee on the job . . . ." *Loudermill,* 470 U.S. at 545 and n. 10, 105 S.Ct. at 1495 and n. 10. If this language

was not narrowly interpreted it would be inconsistent with other language in *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493 ("This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in [her] employment.").

Further, the only significance of treating the June 24–27, proceeding as a pre-termination hearing would be to take the events of June 7, 1991, outside the scope of constitutional scrutiny. Therefore the Court will not permit Plaintiff to shoot herself in the foot on this occasion.

*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (not requiring that the interest be pecuniary).

■ Plaintiff claims the evidence raises issues of material fact of whether Scott and the Board were impartial. First, Board Chairman Scott exhibited his bias towards Gallagher in a public meeting held the day before the Board upheld Gallagher's termination decision. Scott stated, before the Department's labor union, that "we do back Sheriff Gallagher in the decisions he makes." Plaintiff claims this statement establishes issues of fact of whether Scott could make impartial rulings involving decisions made by Gallagher.

Defendants argue that this statement was made to show the Department's support for the new Sheriff. However, in light of the fact this statement was made the day before the Board's decision upholding Gallagher's termination of Plaintiff, it could also be interpreted to mean that Scott had an unyielding alliance to the Sheriff. While there is no allegation that Scott received compensation for ruling in favor of Gallagher, it is not unreasonable to assume that a subordinate official might gain some pecuniary or other type of reward for exhibiting a bias toward his superior. Combined with the fact that Scott may have been relying on Higgins' legal judgments, *see infra,* in making his rulings as Chairman in this matter, the Court finds that there are genuine issues of material fact as to Scott's impartiality.

Next, Plaintiff claims the proceedings improperly mixed the prosecutorial and adjudicative functions. It is undisputed by the parties that Higgins presented Gallagher's case before the Board. It is also undisputed that Higgins acts as legal advisor, not only to Gallagher, but to the entire Department. Plaintiff claims that Higgins not only presented the case before the Board, but also advised the Board, through Chairman Scott.

If the Board considered Higgins as its advisor in this case, he was in effect an adjudicator and prosecutor in the same case. Higgins could not represent Gallagher's termination decision to the Board and at the same time impartially advise the Board. *Cf. Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464. ("[U]nder a realistic appraisal of psychological tendencies and human weaknesses, conferring investigative and adjudicative powers on the same individual poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.").

The facts before the Court raise genuine issues of material fact of the potential improper dual role Higgins played in this matter. Scott testified in Plaintiff's unemployment compensation hearing that Higgins was the Board's advisor in Plaintiff's case.[12] While Defendants dispute the context in which this statement was taken, this is a matter for the trier of fact. Further, the Court finds the portions of the post-termination transcript before the Court lend support to Plaintiff's claim that the Board was relying on Higgins' legal expertise in making its evidentiary rulings.[13]

---

12. The portion of the unemployment compensation hearing testimony of Scott which Plaintiff suggests raises material issues of fact that Higgins was seen as the Board's advisor is as follows:

Q: Now you testified that your role in the grievance hearing was as the chairman of the grievance Board, correct?
A: Yes, sir.
Q: And counsel to the grievance Board was Mr. Higgins, who is here present today, correct?
A: Yes, sir.

13. Turpen: "I object to the hearsay, this is now third hand hearsay...."
Higgins: "If I could respond to that."
Turpen: "We could bring these people in they're right here in town...."

Higgins: "That is for the Board to determine, hearsay is admissible at an administrative hearing. The strict rules of evidence are relaxed for purposes of administrative hearing, and it is for the Board to determine what credibility tends to give each witness and make its own determination what it will accept and what it will not accept...."
Scott: "I think, ah...."
[The Board permitted the witness to continue.]
Turpen: "I object to having this witness characterized to what she admitted or denied...."
Higgins: "The Board will draw its own conclusions when (inaudible) states what Sabrina told him."
Scott: "I believe that I will allow the testimony...."

The Court also rejects Defendants' argument that since there is no evidence before the Court the other four Board members were biased against Plaintiff, the Board's decision was not altered by any perceived bias.[14] Although the Court agrees that there is no evidence that any individual Board member, other than Scott, might have been biased, this does not foreclose Plaintiff's opportunity to establish at trial that the bias of Scott and Higgins may have influenced the decisions of at least two of the other four Board members. *Aetna*, 475 U.S. at 831, 106 S.Ct. at 1590 (Brennan, J., concurring) ("[E]xperience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition."). The Court believes Supreme Court precedent would suggest a procedural due process violation has occurred regardless of the actual harm Plaintiff may have suffered. *Marshall v. Jerrico*, 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980) (recognizing that the Due Process Clause protects both the appearance and the reality of fairness); *Carey*, 435 U.S. at 262, 98 S.Ct. at 1051 ("Petitioners do not deny that a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests."). The fact that Scott may not have altered the outcome would only be relevant to the issue of damages. *Id.* at 266, 98 S.Ct. at 1053 (holding that without proof of actual damages, plaintiff is only entitled to nominal non-punitive damages for the procedural violation).

The Court recognizes language in *Aetna*, 475 U.S. at 828 and n. 5, 106 S.Ct. at 1589 and n. 5, suggests that a procedural due process violation has not occurred if the perceived bias did not alter the outcome. *But see id.* at 829, 106 S.Ct. at 1589 (Brennan, J., concurring) (stating that the influence on the actual outcome is irrelevant to finding the

tribunal was not impartial); *id.* at 830, 106 S.Ct. at 1589 (Blackmun, J., joined by Marshall, J., concurring) (same). In *Aetna*, the Court found that an Alabama Supreme Court Justice improperly sat on a case in violation of the Due Process Clause. In finding a due process violation and in vacating the opinion of the court, the Court relied on the fact that the biased judge[15] might have cast the deciding vote. *Id.* at 826–27, 106 S.Ct. at 1588. The fact the biased judge cast the deciding vote appeared to be important to the majority in determining an appropriate remedy, not in finding a due process violation. *Id.* at 827, 106 S.Ct. at 1588. This would be consistent with the Court's opinion in *Carey*.

The Court also finds that Defendants are not entitled to summary judgment on Plaintiff's claim that she was denied her right to due process when Defendants rejected her request that the Board's decision be made by secret ballot. The Supreme Court has consistently stated that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). While "procedural due process rules are shaped by the risk of error inherent in the truth finding process as applied to the generality of cases," *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976), the Court has also recognized that the boundaries can only be set "according to specific factual contexts." *Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960).

In *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903, the Court created a balancing test to be applied to determine what procedures are due. The Court balanced the private interest at stake, the risk of an erroneous deprivation of that interest under the current procedures, and the probable value of additional or substitute safeguards against the

---

14. Under the Department's procedures the Chairman only votes in the case of a tie. In this case the Board voted unanimously (4–0) to uphold the termination decision.

15. The Court did not decide whether the justice was actually biased, but only whether the monetary temptation involved " 'would offer a possible

temptation to the average … judge to … lead him not to hold the balance nice, clear and true.' " *Aetna*, 475 U.S. at 825, 106 S.Ct. at 1587 (quoting *Ward*, 409 U.S. at 60, 93 S.Ct. at 83) (quoting *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927)).

Government's interest in avoiding the fiscal and administrative burdens the additional or substitute procedures would require. *Id.*

Plaintiff's interest in her continued employment was significant. *See, id.; Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1494 ("We have frequently recognized the severity of depriving a person of the means of livelihood."). If Gallagher retaliated against Plaintiff, then the risk was potentially great that the Board members might also fear retaliation if they voted against upholding Gallagher's decision. While the ability of a secret ballot to lower the risk of an erroneous deprivation is questionable if the retaliation was real, if nothing else, it would have "intrinsic value" [16] as to Plaintiff's perception that the Board could impartially review Gallagher's decision. Although the utility of the secret ballot would not be as effective as requesting a review board composed of members independent of the Department, it does not entail the cost or burdens involved in such a request. Finally, the Court must balance the Plaintiff's strong interest in avoiding an erroneous deprivation against the Department's interest in avoiding the added administrative burdens and financial costs of the secret ballot. *Id.* Defendants did not raise any administrative burdens or costs associated with implementing a Board decision by secret ballot, and the Court is unaware of any added burdens or costs associated with a secret ballot request. Accordingly, Defendants have not met their burden under *Mathews.*

■ Plaintiff's final argument is that her procedural due process rights were violated when she was denied the ability to cross-examine the informant. *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). Defendants argue that Plaintiff's due process rights were not violat-

ed by the Defendants' refusal to allow her to cross-examine the informant. *Meder v. Oklahoma City,* 869 F.2d 553, 555 (10th Cir. 1989). They further argue that even if Plaintiff had a due process right to cross-examine the informant, Defendants did not prohibit Plaintiff from cross-examining the informant. Rather, it was Plaintiff who failed to produce the informant at her post-termination hearing.

■ The right to cross-examination in this context is not absolute. *Meder,* 869 F.2d at 555; *Rosewitz v. Latting,* 689 F.2d 175, 178 (10th Cir.1982). However, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg,* 397 U.S. at 269, 90 S.Ct. at 1021. This circuit has consistently held the right to cross-examination exists when the termination decision is based upon accusations of lying. *Melton v. City of Oklahoma City,* 879 F.2d 706, 722 (10th Cir. 1989), *rev'd in part,* 928 F.2d 920 (10th Cir. 1991); *Walker v. United States,* 744 F.2d 67, 70 (10th Cir.1984). To establish she had a right to cross-examination, Plaintiff must show how her termination might have been different had she been able to cross-examine her accuser. *Meder,* 869 F.2d at 555. Further, if Plaintiff was somehow derelict in protecting her right to cross-examine adverse witnesses, she cannot now complain that her right to cross-examination has been violated. *West v. Grand County,* 967 F.2d 362, 369 (10th Cir.1992).

Plaintiff raises the fact that two of the five alleged violations of the Department's Operating Procedures Manual (Manual), which led to her termination, could have been proved only if the informant's accusations were believed.[17] In fact, all of the sections cited may

---

**16.** The Court in *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980) (citing *Carey,* 435 U.S. at 259–62, 266–67, 98 S.Ct. at 1050–52, 1053–54), stated that the "requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process." The promotion of participation by affect-

ed individuals is what Professor Lawrence Tribe calls the "intrinsic value" of procedural due process. LAWRENCE H. TRIBE, *American Constitutional Law,* p. 666 (2d ed. 1988).

**17.** The May 31 letter, discussed *supra,* claimed Plaintiff violated the following sections of the Manual:

Section 121.01
"Will not commit or omit any acts which constitute a violation of any of the rules, regula-

have relied on the informant's accusations. Since the Court does not have the Board's findings of facts in this matter, the Court can only assume that the Board upheld Gallagher's decision in total.[18]

Defendants contend that the positive drug test alone is enough evidence to uphold the termination decision. However, the relevant issue before the Court concerns the evidence the Board did rely on, not what evidence it could have relied on, in coming to its decision. On the record before the Court, it is impossible to determine whether the Board weighed the informant's accusations in upholding Gallagher's termination decision.

The Court finds that Plaintiff has raised genuine issues of material fact that her due process rights were violated and, thus, the Court must address the individual Defendants' claim of qualified immunity.

Defendants argue the rights Plaintiff claims were violated were not clearly established at the time of Defendants' actions; that Defendants' actions were reasonable and hence Defendants are entitled to qualified immunity. ·

The right to a pretermination hearing before any significant action is taken against an employee was clearly established before May, 1991. Therefore, Defendants' actions were not objectively reasonable if the termination decision was, in essence, made before June 7, 1991. *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495; *Meder,* 869 F.2d at

554. As this involves a question of fact, the Court cannot grant Defendants' motion for qualified immunity on this issue. The right to an impartial hearing was also clearly established before May, 1991. Again, factual issues regarding the Board's impartiality and the improper mixing of prosecutorial and adjudicative functions precludes the Court from granting Defendants' motion for qualified immunity.

A more difficult problem is presented on Plaintiff's claims of procedural due process violations based on the denial of Plaintiff's request to a secret ballot and cross-examination. Since both issues require a case-by-case evaluation, an argument can be made that the law cannot be clearly established unless the facts line up with prior Tenth Circuit precedent. However, in *Melton* the court rejected the notion that the *Harlow* analysis under qualified immunity cannot be reconciled with constitutional violations which require a balancing approach. *See Melton,* 879 F.2d at 729 (applying qualified immunity analysis to First Amendment balancing test). The Court believes the rationale underlying the court's opinion in *Melton,* also should be applied to the balancing test under procedural due process.

As to the denial of cross-examination, if the termination decision was partly based on the credibility of the informant's accusations, prior Tenth Circuit and Supreme Court precedent fairly put the individuals on notice under a *Harlow* inquiry. *Goldberg,* 397 U.S.

tions, duties and responsibilities, directives or orders of this department, including those orders given via radio, or a person of the same or lower rank...."
Section 121.02
"Will conduct themselves on or off duty in such a manner as to reflect most favorably on the department. Conduct unbecoming a member or employee shall include that which brings the department and/or individual member or employee into disrepute or impairs the operation or efficiency of the department."
Section 121.03
"Will obey all laws of the United States of America and of any state and local jurisdiction in which they are present...."
Section 121.05
"Will constantly direct their best efforts to accomplish the functions of the department intelligently, efficiently, competently. They be truthful in all matters relating to their official

duties and employment. They will not engage in any activity or personal business which may cause them to neglect or be inattentive to duty."
Section 121.10
"Will not possess, store, or bring into any department facility or vehicle alcoholic beverages, controlled substances, narcotics, or hallucinogens, except in the performance of their official duties or which has legally been prescribed...."

18. In fact, the only document which evidences the Board's findings in this matter was dated on June 27, 1991, and it states:

"The Grievance Board, by majority decision, has upheld the action of Sheriff Ray Gallagher to terminate Deputy 1/C Sabrina Pike."

It was signed by all four of the voting Board members.

at 269, 90 S.Ct. at 1021; *Walker,* 744 F.2d at 70.

■ The secret ballot request is more troublesome. The Court has found no opinions analyzing this issue. However, as the court stated in *Melton,* this is not dispositive. *Melton,* 879 F.2d at 729. The question the Court must answer is "at the time these events took place, was the protected nature of Plaintiff's [right to a decision by secrecy] sufficiently clear that defendants should have been reasonably on notice that the City's interest [in denying the request] would not survive a [*Mathews* ] balancing inquiry?" *Cf. Melton,* 879 F.2d at 729–30 (applying *Harlow* inquiry to First Amendment balancing test).

The first step in this inquiry is to determine if Plaintiff's interest in continued employment under the first part of *Mathews* was clearly established. *Cf. Patrick,* 953 F.2d at 1246–47 (applying *Melton* test to First Amendment inquiry). The Supreme Court decision in *Loudermill* sufficiently put the Defendants on notice of the important interest Plaintiff has in her job. *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495. Defendants were also on notice that Plaintiff feared the Board could not be impartial because of the potential for retaliation. This is the type of risk of error which would require added procedures under the second step of *Mathews.* While the Defendants need not be held to a correct balance of *Mathews,* they should be held to a reasonably objective application of this "clearly established" law. Since Defendants have not even attempted to advance an interest to justify its refusal of the secret ballot request, the Court finds that the Defendants were reasonably on notice that its actions would not have survived a

*Mathews* balancing test. *Cf. Melton,* 879 F.2d at 729. Therefore, the Court denies Defendants' motion for summary judgment.

## VII. SUBSTANTIVE DUE PROCESS

Defendants make two arguments in support of their motion for summary judgment on Plaintiff's substantive due process claim. First, Defendants argue that Plaintiff has not raised any genuine issues of material fact that her termination was arbitrary, capricious, or pretextual. Second, even if Plaintiff has established that her termination was arbitrary, capricious or pretextual, her right to continued employment is not protected by substantive due process. *See Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Mangels v. Pena,* 789 F.2d 836 (10th Cir. 1986).

Plaintiff argues she has raised genuine issues of material fact that her termination was arbitrary, capricious or pretextual. Further, she claims her property interest in her job is protected by substantive due process. *Martin v. Harrah Indep. School Dist.,* 579 F.2d 1192 (10th Cir.1978), *aff'd,* 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979) (per curiam); *Brenna v. Southern Colorado State College,* 589 F.2d 475 (10th Cir.1978).

■ As to Defendants' first claim, the Court finds Plaintiff has raised genuine issues of material fact that her termination was pretextual.[19] As discussed *supra,* part IV, First Amendment claim, the Court found Plaintiff has raised material issues of fact of whether the May 13, 1991, urinalysis and her subsequent termination for a positive drug result was pretextual. Further, as discussed *supra,* part III, Exclusionary Rule, Plaintiff's

---

19. Defendants claim that without any constitutional violations Plaintiff has not raised genuine issues of fact that her termination, based solely on the positive drug test, was arbitrary and capricious. If there was no dispute as to the reliability of Plaintiff's urine sample, the Court would agree. Plaintiff has not raised any genuine issues of material fact that termination was not the proper punishment for a positive drug test. However, Plaintiff has raised genuine issues of material fact as to the reliability of her positive drug test.

She has challenged the Department's interpretation of retest and the lack of a chain of custody

regarding her urine sample of May 13, 1991. She has also submitted three negative drug tests, one taken on May 14, 1991, to raise material issues of fact of whether the May 13, 1991, result was reliable. Further, no one within the Department ever witnessed any conduct which would suggest Plaintiff was using drugs. Therefore, a reasonable jury could find that the May 13, 1991, drug result was not reliable. Thus, a reasonable jury could further find that Plaintiff's termination, based solely on the May 13, 1991, drug test, was arbitrary and capricious.

termination decision cannot be based on an unconstitutional urinalysis test. The Court will next address Defendants' second argument.

The Supreme Court and the Tenth Circuit have applied substantive due process review to public employees who have a property interest in their jobs. *Martin*, 440 U.S. at 194, 99 S.Ct. at 1062 (applying substantive due process review to tenured school teacher); *Brenna*, 589 F.2d at 475 (applying substantive due process review to tenured college professor).

In *Ewing* the Court accepted the parties' stipulation that the petitioner's interest in continued academic enrollment was protected by both procedural and substantive due process. *Ewing*, 474 U.S. at 222, 106 S.Ct. at 511. However, in dicta, the majority did question whether all state created property rights protected by procedural due process were also protected by substantive due process. *Id.* at 222–23, 106 S.Ct. at 511–13. The decision in *Ewing* reopened the question as to whether all property interests protected by procedural due process are also protected by substantive due process.[20] *Jacobs, Visconsi & Jacobs v. City of Lawrence*, 927 F.2d 1111, 1119 (10th Cir.1991); *Archuleta v. Colorado Dep't of Inst.*, 936 F.2d 483, 489 n. 6 (10th Cir.1991); *Mangels*, 789 F.2d at 839; *but see Harris v. Blake*, 798 F.2d 419, 424 (10th Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987) (applying substantive due process review to academic decision citing *Ewing* for support).

This is also a question on which the circuits are split.[21]

In his concurring opinion in *Ewing*, Justice Powell pronounced that the right to continued academic enrollment is not the type of property right which would " 'require particularly careful scrutiny of the state needs asserted to justify their abridgment' " under substantive due process. *Id.*, 474 U.S. at 229, 106 S.Ct. at 515 (quoting *Moore v. East Cleveland*, 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (plurality opinion) (quoting *Poe v. Ullman*, 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)).

However, this case is distinguishable from both *Ewing* and *Mangels*. In *Ewing* the issue was whether an academic decision could be the basis of substantive due process review. It is worth noting that the Court did not cite its opinion in *Martin*, 440 U.S. at 194, 99 S.Ct. at 1062, which applied substantive due process review to an employer termination decision. *Id.* at 198, 99 S.Ct. at 1064. Further, *Martin* was decided a year after the Supreme Court decision in *Board of Curators v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), which, like *Ewing*, did question the applicability of substantive due process review to academic decisions. *Id.* at 91–92, 98 S.Ct. at 955–56. The majority and the concurring opinions in *Ewing* contain no language to suggest that substantive due process does not protect property rights.[22] The Court only questioned, with-

**20.** *Perry*, 408 U.S. at 601, 92 S.Ct. at 2699 (the Court stated that property has a "broad" meaning for procedural due process purposes).

**21.** In *Schaper v. City of Huntsville*, 813 F.2d 709, 719 (5th Cir.1987); *Moore v. Warwick Public School Dist.*, 794 F.2d 322, 328–29 (8th Cir. 1986); *Barnett v. Housing Auth.*, 707 F.2d 1571, 1577 (11th Cir.1983), the courts applied substantive due process review to state created contractual rights. In *McKnight v. Southeastern Penn. Trans.*, 583 F.2d 1229, 1233 n. 4 (3d Cir.1978); *Parham v. Hardaway*, 555 F.2d 139, 142 (6th Cir.1977); *Kowtoniuk v. Quarles*, 528 F.2d 1161, 1166 (4th Cir.1975), the courts, without having to specifically address the issue, did not question the applicability of substantive due process review of property rights. In *Perkins v. Board of Educ.*, 686 F.2d 49, 51 n. 5 (1st Cir.1982), the court questioned, without deciding, if substantive

due process review was appropriate when an institution failed to follow its own procedures.

Only one circuit has ruled that state created contract rights should not be reviewed under a substantive due process analysis. *Brown v. Brienen*, 722 F.2d 360, 367 (7th Cir.1983).

**22.** Certain property must be protected by substantive aspects of the Fourteenth Amendment's Due Process Clause, since the Court has incorporated the Just Compensation Clause of the Fifth Amendment to the states through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980) (citing *Chicago, B & Q. R. Co. v. Chicago*, 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897)); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 122, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978).

out deciding, if all state created property rights, protected by procedural due process, are protected by substantive due process. *Id.*, 474 U.S. at 222, 106 S.Ct. at 511; *id.* at 229, 106 S.Ct. at 515 (Powell, J., concurring) ("Even if one assumes the existence of a property right, however, not every such right is entitled to the protection of substantive due process."). The Court appeared to only question the applicability of substantive due process review of an academic decision when the "arbitrary and capricious" acts complained of, are themselves not independent violations of the Constitution. *Ewing*, 474 U.S. at 225, 106 S.Ct. at 513 ("Nor can the Regents be accused of concealing nonacademic or constitutionally impermissible reasons for expelling Ewing....").

In *Mangels*, the court found no privacy violation in the state's disclosure of drug usage by plaintiffs. *Mangels*, 789 F.2d at 840. The court reasoned that plaintiffs have no fundamental interest in privacy, protected by the Fourteenth Amendment, when the state discloses facts of illegal drug use. Further, the opinion stated that a state's promise of confidentiality does not create a right protected by substantive due process. *Id.* at 839 citing *Ewing*, 474 U.S. at 229, 106 S.Ct. at 515 (Powell, J., concurring) ("Rights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution.").

■ Defendants believe *Ewing* and *Mangels* stand for the proposition that substantive due process protects only property rights created by the Constitution. This cannot be so since the Constitution does not create property rights. *Martin*, 579 F.2d at 1198 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) ("Property interests, of course, are not created by the constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support

claims of entitlement to those benefits.")). Therefore, the question before the Court is not whether state created property rights are protected under substantive due process, but whether Plaintiff's interest in continued employment is the type of interest the "ancient institution of property"[23] is to protect from being "arbitrarily undermined." *See Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. This circuit has held that an employee's interest in continued employment is the kind of claim which substantive due process protects. *Martin*, 579 F.2d at 1198. The Court finds that Plaintiff has raised genuine issues of material facts which are protected by substantive due process and, therefore, the Court must address the individual Defendants' claim of qualified immunity.

■ Defendants claim that the right to substantive due process review was not clearly established for a deprivation of an employment interest, and therefore, they are entitled to qualified immunity.

Only two cases, which immediately concern our analysis, have specifically addressed the issue of substantive due process review of property rights in public employment. Both of those decisions held that substantive due process review applies. *Martin*, 440 U.S. at 198, 99 S.Ct. at 1064; *Brenna*, 589 F.2d at 477. There is further support in this circuit that substantive due process applies to all state created property rights. *Harris*, 798 F.2d at 424; *McGhee v. Draper*, 564 F.2d 902, 912 (10th Cir.1977); *Weathers v. West Yuma County School Dist.*, 530 F.2d 1335, 1342 (10th Cir.1976). All of the above decisions were decided well before the complained of acts of the Defendants.

In *Ewing* the majority only questioned whether the right to continued academic enrollment is the type of property interest protected by substantive due process review. Since neither the majority or Justice Powell questioned the Court's decision in *Martin*, *Ewing* must be limited to its facts. Further, the majority appeared to only question the appropriateness of reviewing academic deci-

---

**23.** *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709 ("It is a purpose of the ancient institution of property to protect those claims upon which people rely in

their daily lives, reliance that must not be arbitrarily undermined.").

sions, under substantive due process, when the alleged deprivation is not the result of an independent violation of a constitutional right. *Id.*, 474 U.S. at 225, 106 S.Ct. at 513. *See Archuleta*, 936 F.2d at 490 (questioning if substantive due process review applies to state created property rights where there is no independent constitutional violation); *Jacobs*, 927 F.2d at 1115–20 (same); *Kauth v. Hartford Insurance Co.*, 852 F.2d 951, 958 (7th Cir.1988) (holding that substantive due process does not apply to state created property rights without an independent violation of a substantive constitutional right). Since the Court has already found that Plaintiff's termination may have been in retaliation for her protected speech, and based on an unconstitutional search, Plaintiff has raised issues of material fact that her property interest was terminated based on independent violations of the Constitution. The Court finds that Plaintiff's substantive due process claim was clearly established under Tenth Circuit precedent, and, therefore, the Court denies Defendants' motion for summary judgment.

## VIII. WRONGFUL TERMINATION

Defendants claim they are entitled to summary judgment as to Plaintiff's state wrongful termination claim because Plaintiff was under contract with the Department at the time of her termination. *Silva v. Albuquerque Assembly & Distrib. Freeport Warehouse Corp.*, 106 N.M. 19, 738 P.2d 513 (1987). Plaintiff claims her wrongful discharge claim may be brought under N.M.Stat.Ann. § 41–4–12 (Michie 1978) (Torts Claim Act) since the state has waived immunity for constitutional violations committed by police officers acting within the scope of their duties.

The Court agrees that Plaintiff could have brought a state claim under the Torts Claim Act. However, the only state claim before the Court is one for wrongful discharge. "The express reason for recognizing this tort, and thus modifying the terminable at-will rule, was the 'need to encourage job security' for those employees not protected from wrongful discharge by an employment contract." *Silva*, 738 P.2d at 515 (quoting *Vigil v. Arzola*, 102 N.M. 682, 688, 699 P.2d 613, 619 (Ct.App.1983) *rev'd in part on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984)).

Thus, the ability to bring a claim of wrongful discharge is not whether it has been "waived" by the state, but whether Plaintiff has a contract right in continued employment. *Silva*, 738 P.2d at 515. Since Plaintiff's job as a police officer was protected by an employment contract, she cannot bring a wrongful discharge claim. Therefore, the Court grants Defendants' motion for summary judgment as to Plaintiff's wrongful termination claim.

Wherefore,

**IT IS ORDERED, ADJUDGED AND DECREED** that Defendants' motion for summary judgment as to Count VI of Plaintiff's first amended complaint (Wrongful Discharge claim) be, and hereby is, granted.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment as to Count I of Plaintiff's first amended complaint (First Amendment claim) be, and hereby is, denied.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment as to Count II of Plaintiff's first amended complaint (Property Due Process claim) be, and hereby is, denied.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment as to Count III of Plaintiff's first amended complaint (Liberty Due Process claim) be, and hereby is, denied.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment as to Count IV of Plaintiff's first amended complaint (Substantive Due Process claim) be, and hereby is, denied.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment as to Count V of Plaintiff's first amended complaint (Fourth Amendment claim) be, and hereby is, denied.